**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Allan J. SOLOMON,**
**Defendant-Appellant.**

**No. 81–2954.**

United States Court of Appeals,
Seventh Circuit.

Argued June 1, 1982.
Decided Sept. 22, 1982.

---

**6.** Appellants raise other arguments which need not be addressed in view of our holding.

Kenneth L. Cunniff, Chicago, Ill., for defendant-appellant.

Michele Smith, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY and COFFEY, Circuit Judges, and GRANT,* Senior District Judge.

COFFEY, Circuit Judge.

This case represents an appeal from the defendant's convictions for filing a fraudulent income tax return in 1974 and failing to file an income tax return in 1975 in violation of 26 U.S.C. § 7206(1) and 26 U.S.C. § 7203, respectively. Affirmed.

The defendant, Allan Solomon, contends that the trial court committed error when it allowed the government to present evidence of the defendant's flight to Denver, Colorado and his assumption of a new name in that locality. The defendant also charges that the trial court erred when it denied his motion to dismiss the indictment because of prejudicial and inexcusable pre-indictment delay. Finally, the defendant argues that he should be granted a new trial because the court erred in denying his motion for a mistrial based on the government's failure to disclose exculpatory material before trial, and that the trial court was incorrect in limiting cross-examination and thus prohibiting him from cross-examining two witnesses concerning the payment of $20,000 to settle a civil lawsuit pending against Solomon Realty.

The defendant is charged with failing to report income received from a number of real estate transactions on his 1974 and 1975 federal income tax returns. In 1971, Drs. Richard Markey and Peter Ferrini purchased forty-eight acres of real estate through Solomon Realty, a real estate company owned by the defendant's father, Adolph Solomon.[1] The Drs. Markey and Ferrini were told by Adolph Solomon that they were buying the land from one Peter Halligan,[2] with all payments on the contract to be made to Solomon Realty. The purchase price of the forty-eight acre tract was approximately $160,000, and the purchase agreement contract called for annual payments of approximately $20,000 plus interest from each of the doctors over a three year period. The final $40,000 payment on the land was due on March 1, 1974. Dr. Markey gave the defendant's father, Adolph Solomon, a check made out to Peter Halligan for $10,000 and asked for an extension of time on the payment of the second $10,000. Dr. Markey was granted a six-month extension.[3] Some time later, Dr. Markey was approached by the defendant, Allan Solomon, who informed the doctor that Peter Halligan needed his final $10,000 payment at this time. When Dr. Markey replied that he was unable to make the final payment at present, and would not be able to make it until such time as he was able to close another real estate transaction, the defendant suggested to Markey that his wife, Reva Solomon, would loan him (Markey) the money to make the final payment. Dr. Markey wrote a check for $5,000 payable to Reva Solomon in part payment of her alleged loan to him, and gave the defendant a note payable to Reva Solomon for the remaining $5,000 of the debt. The defendant cashed the $5,000 check payable to Reva Solomon and deposited the proceeds into his checking account. The defendant later had Dr. Markey's note discounted at a local bank and also deposited these funds into his checking account. Reva Solomon testified at trial that she had no knowledge of the loan to Dr. Markey nor had she

---

* Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

1. According to the record, a number of members of the defendant's family either worked for or had ownership interests in Solomon Realty. These include Fred Solomon, the defendant's uncle, and Sidney Traub, another relative of the defendant.

2. At the time the doctors purchased the forty-eight acre tract, it was owned by Peter Halligan and Mr. Halligan was represented by Jennings Realty of Chicago.

3. Adolph Solomon, Fred Solomon and Sidney Traub were all present at the meeting when Dr. Markey was granted a six month extension on his $10,000 payment. The defendant was not present at this meeting.

endorsed any checks written to her by Dr. Markey. The defendant is charged in the federal indictment with receiving these payments from Dr. Markey and failing to report the same as income on his 1974 income tax return as required by the Internal Revenue Code.

Dr. Ferrini gave Solomon Realty a check made out to Peter Halligan for $11,200 in February of 1974 and asked for time to pay the remaining $10,000 due and owing. The defendant deposited the check from Dr. Ferrini into his checking account on February 28, 1974. Peter Halligan, the seller, testified that he never endorsed this check, and that he was unable to recall ever having received any payments directly from Dr. Markey. Some time later, the defendant Solomon contacted Dr. Ferrini and told Ferrini that Mr. Halligan was in need of the final $10,000 payment. Allan Solomon then suggested to Ferrini that he execute a note and that he (Solomon) would have the note discounted at a bank and use the proceeds from this transaction to make the final payment to Peter Halligan. Dr. Ferrini executed the ninety-day note made out to the First National Bank in Chicago Heights as requested for $10,000. In March of 1974 the defendant discounted this note and deposited the proceeds into his checking account. Following the same *modus operandi* the defendant failed to report this income on his 1974 income tax return, in violation of the Internal Revenue Code.

Also in 1974, the defendant told both Drs. Ferrini and Markey that the real estate taxes were due on the forty-eight acre parcel of land. Dr. Ferrini gave the defendant a check for $346.90 payable to Reva Solomon and Dr. Markey gave the defendant a check for $346.45 to cover his portion of the real estate taxes. The defendant cashed both Drs. Markey's and Ferrini's checks even though neither the defendant nor Reva Solomon nor Solomon Realty had paid the real estate taxes on the forty-eight acre tract. The defendant also failed to report this $693.35 as income on his 1974 income tax return.

The above recitation of payments reveals that in 1974 the defendant defrauded Drs. Markey and Ferrini, and received $10,212.21 and $21,355.81 from them, respectively. These amounts were not reported by the defendant as income on his 1974 tax returns as required by the Internal Revenue Code.

In early 1974 one Willie McGregory called upon Solomon Realty to purchase some farm land. The defendant, Allan Solomon, purported to sell five acres of Drs. Ferrini's and Markey's land to McGregory for $5,000 per acre, for a total sales price of $25,000, without the doctors' consent or knowledge. Mr. McGregory gave Allan Solomon the first $2,000 down payment on the land purchase in January of 1974. Thereafter, Mr. and Mrs. McGregory made periodic payments to the defendant Solomon on the property during 1974 totaling $4,250. The defendant either cashed and/or deposited all of this money. The defendant Solomon again failed to report this income on his 1974 tax return.

During 1975, in addition to the $4,250 they had already paid, the McGregorys made seven more payments to the defendant, totaling $3,000, to secure the land they had contracted to purchase. Even though the defendant had agreed to give the McGregorys title to one of the five acres of land after they had paid the sum of $5,000 and the McGregorys had now paid the defendant $7,250, the defendant refused to give the McGregorys the deed to the land. The defendant deposited or cashed all these McGregory checks, and failed to report these monies.

Although he had not received the deed, and believing that he owned the property and acting on the assurances of the defendant, McGregory began construction of a home on a portion of a one acre plot of land in 1975. Dr. Markey discovered McGregory's building and construction taking place, and approached McGregory at his place of work, telling him (McGregory) that he (Markey) and Dr. Ferrini owned this parcel of land. Eventually, McGregory negotiated a new deal to purchase this land from Drs. Markey and Ferrini and agreed to pay them an additional $2,500 per acre.

In 1975, the defendant contacted Dr. Ferrini and told him that a twenty-five foot parcel of land which was adjacent to some land which Dr. Ferrini owned in Chicago Heights was available for sale. Solomon told Dr. Ferrini that the purchase price was $1,250, and Dr. Ferrini wrote a personal check to the defendant for that amount. The defendant cashed Ferrini's check on May 1, 1975 and failed to turn the proceeds from this check over to the owners of this twenty-five foot parcel of land and failed to report this $1,250 as income in his 1975 income tax return.

In 1975 the defendant, Allan Solomon, again approached Dr. Markey and asked Dr. Markey to invest in the purchase of a farm, consisting of a barn and brick home, for the purposes of converting these buildings into a restaurant and accompanying shops. Markey agreed to invest $8,333 which represented one-third of the $25,000 down payment and thereby obtain a one-third interest in the venture. Because Markey still owed $3,000 on the purported loan from Reva Solomon, he executed a note for $11,-333, representing the $8,333 he was investing into the farm and the payment of $3,000 on the 1974 "loan." The defendant discounted this note and deposited the proceeds into his checking account on February 3, 1975. The defendant never transmitted Markey's $8,333 payment to the owner of the farm, Mary Smit, but rather kept the money and also failed to report this $8,333 in his 1975 income tax return.

In March of 1975 the defendant, again focusing on the medical profession, sent a telegram to a Dr. Myriam Wilson Leonardo who had previously demonstrated an interest in purchasing the defendant's home. The defendant informed Dr. Leonardo that the current asking price had been lowered to $160,000. Dr. Leonardo contracted with the defendant to purchase the house for that price, and made a total down payment of $16,000 to the defendant in the form of four different checks. The defendant deposited all of these checks into his personal checking account. The defendant's wife, Reva Solomon, testified at a deposition that she never authorized the sale of the family home for $160,000, and never signed a sales contract or received any of the $16,000 down payment from Dr. Leonardo. In fact, Reva Solomon testified that as of May of 1975 she and the defendant Allan Solomon had agreed to a divorce. The $16,000 was not returned to Dr. Leonardo and the defendant once more failed to report this income on his 1975 tax return.

In April of 1975, the defendant still on the search for loose money, contacted Donald E. Mortell and formed a corporation called Balmoral Wood Stable, Inc. for the purposes of constructing a riding stable on the grounds of the financially troubled Fairwinds Holiday Inn in Crete, Illinois. On April 24, 1975 Mortell gave the defendant a check for $2,500 representing Mortell's portion of the "start-up cost" for the operation of the riding stable and for construction of a corral. Construction was begun, but never completed. The contractor, Robert French, incurred approximately $1,800 in expenses before the defendant told him to stop construction of the stable. French failed to receive any money from the defendant or anyone else on his behalf for the partial construction of the stable. The defendant did not report the $2,500 received from Donald Mortell as income in 1975.

In May of 1975, while auditing the tax returns of Adolph Solomon, Internal Revenue Agent James Sinda began an audit of the defendant's tax returns for the years 1972, 1973 and 1974. On May 27 of 1975, Agent Sinda visited with the defendant and conducted an initial interview at the offices of Solomon Realty. During this initial interview, the defendant, Allan Solomon, informed Agent Sinda that his income consisted of commissions on real estate sales. The defendant promised Agent Sinda a copy of his 1973 tax return and the books and records which were used in computing this tax return, and set up an appointment with Agent Sinda for June 2, 1975. Two days after this initial meeting with Agent Sinda, the defendant absconded, left his family and traveled to Denver, Colorado with Esther Solomon, his first wife. The

defendant rented an apartment in Denver, Colorado under the name of Nicholas A. Bartlis. While in Denver, the defendant applied for a bank loan using a false social security number. Authorities were unable to locate the defendant until his arrest in Florida on October 21, 1980 some five years later.

On December 29, 1978, while the defendant was on the lam, a grand jury returned a two-count indictment against the defendant charging him with making a false statement of material fact on his 1974 income tax return by understating his total income for that year in violation of 26 U.S.C. § 7206(1), and with failing to file a federal income tax return for the year 1975, even though he had gross income of at least $33,156.98, in violation of 26 U.S.C. § 7203. The defendant was tried before a jury and was found guilty on both counts.

Issues

1. Did the trial court err and abuse its discretion in admitting into evidence the defendant's flight and concealment in order to establish his guilt?

2. Did the trial court err in denying the defendant's motion for a mistrial based on the government's failure to disclose prior to trial the results of the IRS preliminary investigation setting forth the IRS belief that Adolph Solomon derived income from the transfer of the forty-eight acre tract and that this failure to disclose these documents was in violation of *Brady v. Maryland?*

3. Did the trial court err in denying the defendant's motion to dismiss the indictment on the grounds of prejudicial and inexcusable pre-indictment delay?

4. Did the trial court err in prohibiting the defendant from introducing evidence concerning the settlement of a civil suit?

1. Flight and Concealment.

The defendant contends that the trial court erred in admitting evidence of his flight to Denver and his assumption of a fictitious name while in residence there. The defendant also contends that the trial court's admission into evidence of his flight and concealment of identity while in Colorado allowed the jury to hear unduly prejudicial circumstantial evidence and thereby deprived him of a fair trial.

It is a well settled area of law that evidence of flight and concealment is admissible to show consciousness of guilt, as well as guilt itself. *United States v. Hampton,* 457 F.2d 299 (7th Cir.), *cert. denied,* 409 U.S. 856, 93 S.Ct. 136, 34 L.Ed.2d 101 (1972). In *United States v. Jackson,* 572 F.2d 636 (7th Cir. 1978), this court adopted the test set forth in *United States v. Myers,* 550 F.2d 1036, 1049 (5th Cir. 1977), to determine the circumstances under which a jury may consider a defendant's flight as circumstantial evidence of the defendant's consciousness of his guilt and of his actual guilt.

[T]he probative value of flight as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

572 F.2d at 639. This four-pronged test has become known as the *Myers* test.

The defendant attacks the third inference to be drawn in the *Myers* analysis, i.e. the inference that the defendant's flight and concealment demonstrated his consciousness of guilt of the crimes he was charged with in the indictment. The defendant asserts that he only met with Revenue Agent Sinda on one occasion, and that this meeting related to "a civil audit which could only have assessed a civil penalty; in fact no criminal investigation was initiated until a substantial time later." The defendant argues that his leaving town for a few days after the interview with Sinda is "open to various other interpretations." The defendant contends that to infer from these facts his consciousness of guilt of offenses relating to his 1974 and 1975 income taxes is nothing but speculation, especially in light of the fact that his 1975 tax

returns were not even due. We disagree with the defendant's position and hold that since there was a sufficient connection between the Internal Revenue Service civil audit of the defendant's income tax returns and the defendant's flight to Denver and concealment there, the *Myers* test was met and the trial court was correct in allowing the government to present evidence of the defendant's flight and his change of name and identity and thereby aid in establishing the defendant's guilt.

"Generally, the third and fourth inferences of the four-part *Myers* test are the most difficult to establish and courts have placed great reliance on the proximity in time of the flight to the crime charged in order to establish these inferences." *United States v. Howze,* 668 F.2d 322, 324–25 (7th Cir. 1982). Here, the defendant testified that he left Chicago for Denver, Colorado two or three days after his meeting with Agent Sinda on May 27. Further, the defendant also testified that during his initial interview with Agent Sinda he told Agent Sinda he would provide him with a copy of his (the defendant's) 1973 tax return, when in fact the defendant had never filed a return for that year. Moreover, the evidence at trial revealed that during the years 1973 and 1974 the defendant had received and deposited into his checking account substantial sums of money from a number of fraudulent real estate transactions. The Internal Revenue Code required the defendant to report this money as income, but the defendant failed to report the same. Furthermore, as noted above, courts place great weight on the proximity in time between the crime charged and the defendant's flight. *Howze,* 668 F.2d at 325. In light of the fact that the defendant left Chicago just two to three days after his initial interview with Agent Sinda, the first interview the defendant had with someone auditing his tax returns, we hold that the relative proximity in time between the interview and the defendant's flight and concealment is sufficient to establish that the defendant fled because of his consciousness of his guilt and because of his contact with Agent Sinda. Moreover, a fair inference can be

drawn from the defendant's flight that he was conscious of his guilt concerning his income taxes, and that this consciousness of his guilt caused by his failure to file a tax return in one year and his failure to accurately report his income in another year demonstrated his guilt of the crimes.

2. *Brady* Material.

During the criminal trial of Allan Solomon, at the time of the defendant's cross-examination of IRS Agent Sinda, the prosecution and the defense simultaneously learned of the existence of an Internal Revenue Service document relating to the civil audit of Adolph Solomon. This document sets forth IRS Civil Division's preliminary belief that Adolph Solomon was liable for deficiencies on his income tax returns because he (Adolph) allegedly failed to report a $90,355 gain from the sale of a certain forty-eight acre tract of land. After being advised of the existence of this surprise document, the trial court made it immediately available to the prosecution and the defense for their inspection. The trial judge then ruled that the document was not relevant or material, not covered by *Brady v. Maryland,* and would not be received in evidence.

It was and is the position of the defendant, Allan Solomon, that this document is relevant and exculpatory for he believes it supports his theory that he was not required to report the $20,000 of income earned in 1973 for the forty-acre tract. He contends he received this money for Solomon Realty and therefore it should be attributed to his father, Adolph. The defendant asserts that because the document is relevant and exculpatory and since the government failed to disclose this document despite a request by the defendant for exculpatory material, that a mistrial should have been granted by the trial court. We disagree with the defendant and hold that because the document is not material to the issues of whether Allan Solomon received the $20,000, converted it to his own use and failed to report it on his tax returns, even if the IRS had never produced this document,

no violation of *Brady v. Maryland* would exist.

*Brady v. Maryland* recites that:

[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963).

■■■■ Our review of *Brady* and relevant case law reveals that before ruling that the prosecution violated the *Brady* rule, the trial court must make a threshold determination that the "suppressed" evidence is material to the guilt or punishment of the defendant. *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972). *Brady* cannot be read as requiring that "as a matter of constitutional law everything must be disclosed which might influence a jury." *United States v. Orzechowski,* 547 F.2d 978, 985 (7th Cir.), *cert. denied,* 431 U.S. 906, 97 S.Ct. 1701, 52 L.Ed.2d 391 (1977). When a defendant claims he was denied due process on the grounds that the prosecution suppressed favorable evidence, "the defendant is not entitled to reversal unless 'in light of all the evidence' introduced at trial the unrevealed evidence is material." *United States v. Esposito,* 523 F.2d 242, 249 (7th Cir. 1975), *cert. denied,* 425 U.S. 916, 96 S.Ct. 1517, 47 L.Ed.2d 768 (1976). Moreover, "the trial court has wide discretion in determining the relevancy and materiality of evidence in a case. Its ruling will not be disturbed in the absence of a clear showing of abuse of that discretion." *United States v. Resnick,* 508 F.2d 799, 800 (5th Cir.), *cert. denied,* 423 U.S. 861, 96 S.Ct. 118, 46 L.Ed.2d 89 (1975). After a thorough examination of this document we agree with the finding of the trial court and hold that the information contained in the transmittal document was not material, relevant or exculpatory on the issues of guilt, innocence or punishment at Allan Solomon's trial for tax fraud.

Evidence is material if it is probative of a matter in issue. As noted by the trial court, the ultimate issue to be decided by the jury was "one, whether or not Allan got the money, and two, whether as a result of him getting it whether he was taxable for the proceeds because he enjoyed the use and benefitted from the money." As noted above, a ruling on the materiality of evidence is within the sound discretion of the trial court and will not be overturned unless an abuse of discretion can clearly be shown. *Orzechowski,* 547 F.2d at 985. Our review of the record reveals that the trial court articulated sound reasons why the IRS document was not material to an issue in the case against Allan Solomon, and our independent review of this document supports the trial court's conclusion that the document was not material. Therefore, in view of all the evidence and from our thorough review of this transmittal document, we hold the unsubstantiated preliminary position of the Civil Division of the IRS that somehow Adolph Solomon was chargeable with gain from the sale of the forty-eight acres is not probative and we agree with the trial court and further hold that the transmittal document is not material to the issue of whether Allan Solomon received the $20,000, diverted it to his own use and/or failed to pay taxes on it. Because this document is not material to the issue of the defendant's guilt, innocence or punishment, we hold that the failure of the IRS to produce this document until trial does not violate the disclosure requirements of *Brady v. Maryland.*

3. Pre-indictment Delay.

■■■■ The defendant contends that the trial court erred in denying his motion to dismiss the indictment because of pre-indictment delay. The defendant notes that he was initially interviewed by IRS agents conducting a civil audit on May 27, 1975. On September 23, 1975 after the agents attempted on several occasions to contact the defendant, the defendant's case was referred to the Intelligence Division of the Criminal Division of the IRS for review. After their thorough and independent investigation of the facts of the case, the case

was forwarded for prosecution to the U.S. Attorney's Office in August of 1978. An indictment was returned by a grand jury some four months thereafter, on December 21, 1978. This type of progression of a case from initial audit to the issuance of an indictment by a grand jury is typical of the processing of a dispute by the IRS. The defendant contends that the lapse of three and one-half years from the initial audit and interview until the return of the indictment was prejudicial to the defendant, and should result in a dismissal of the indictment. We disagree with the defendant's argument since the defendant has failed to establish to this court's satisfaction that he was actually prejudiced by any pre-indictment delay caused by the government's actions. Furthermore, any delay in the normal IRS procedures was caused by the defendant's own actions in absconding from Chicago, changing his identity and making himself unavailable for further investigation and interviews for a period of five years and therefore this delay was caused by the defendant and cannot give rise to reversible error. One cannot defeat the law by his own contrivances. *United States v. Bell,* 476 F.2d 1046 (7th Cir. 1973).

■ As a general rule, the statute of limitations is a defendant's primary safeguard against prejudice from prosecutorial delay. *United States v. Lovasco,* 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). The statute of limitations for 26 U.S.C. §§ 7206(1) and 7203 is six years, and the indictment in this case fell well within the six year period. However, the due process clause of the fifth amendment also protects defendants from excessive pre-indictment delay. To invoke the extreme sanction of dismissal of the indictment under the due process clause, the defendant must establish with proof certain that the pre-indictment delay was not only caused by the government but also substantially prejudiced his defense. *See United States v. King,* 593 F.2d 269, 271 (7th Cir. 1979). The government need not explain the reasons for the delay until after the defendant has met his burden of establishing actual prejudice. Once the defendant has estab-

lished actual prejudice to the court's satisfaction, and we hasten to point out he has not met that burden of proof, the court will then undertake a balancing of the reasons asserted by the government against the prejudice alleged by the defendant when called upon to make the determination as to whether an indictment should be dismissed. *Lovasco,* 431 U.S. at 789–90, 97 S.Ct. at 2048–49.

■ The defendant makes the general allegation that he was prejudiced by the pre-indictment delay because two potential witnesses, Adolph Solomon and Sidney Traub, the other principals in Solomon Realty, died prior to the issuance of the indictment. However, the death of a witness alone is insufficient to establish actual prejudice. *Lovasco,* 431 U.S. 785, 790, 97 S.Ct. 2046, 2048. Moreover, we fail to see how the testimony of Adolph Solomon would have helped the defendant in light of Adolph's sworn affidavit, which states: "Allan Solomon was to collect [the $20,000] and turn it over to me. Allan did not turn the money over to me. I did not give Allan permission to keep the money. I paid $20,000 in repayment of the $20,000 Allan took from [Drs. Markey and Ferrini]. I do not consider this as being a loan to my son." Indeed, the general allegations made by the defendant fail to reveal how the defendant was prejudiced by this delay. Moreover, the real cause of the delay was occasioned by the defendant's own actions, in that Internal Revenue Service investigators were unable to contact him concerning the civil audit of his income tax returns due to his five-year flight to Denver, change of identity, obtaining false Social Security cards and concealment. If we were to accept and give credence to the defendant's position, we would then encourage others to avoid prosecution by taking flight when informed of a pending investigation, thereby frustrating the efforts of law enforcement officials and substantially adding to the time and expense of conducting a thorough investigation and bringing a case to trial when warranted. Although the defendant asserts that he was actually prejudiced by

the death of Adolph Solomon or Sidney Traub, an earlier indictment would not have solved the problem of the unavailability of these witnesses. The defendant fled from Chicago on May 29, 1975 and was not arrested until October, 1980, long after the witnesses had passed away (Adolph Solomon died on August 5, 1978; Traub died in August, 1977). We hold that the trial court's denial of the defendant's motion to dismiss the indictment on the grounds of pre-indictment delay was proper as the defendant has failed to establish that he was prejudiced by any alleged delay on the part of the government.

### 4. Evidence of Settlement.

Before testimony was given in this case, the government presented a motion for an evidentiary ruling precluding the defendant from introducing testimony through cross-examination of Drs. Markey and Ferrini that Adolph Solomon paid Drs. Markey and Ferrini $20,000 in reimbursement for the additional payment the doctors had to make in order to get title to the forty-eight acre parcel of property. It was the defendant's position that this $20,000 payment was made to settle a civil suit brought by the doctors against Adolph Solomon and that the settlement showed that Adolph Solomon had in fact received the $20,000 charged as income to the defendant. The trial court refused to allow this evidence to be received in the record on the grounds that it was not relevant because the payment of the $20,000 by Adolph Solomon did not relate to the receipt of the money by the defendant in the first instance, but rather simply evidenced a desire on the part of Adolph Solomon to settle a civil suit pending against him and Solomon Realty. The defendant contends that the trial court erred in this matter and that the trial court's ruling violated the defendant's right to confront witnesses against him and fatally impaired his defense.

■ It is a well settled rule of law that a trial court has broad discretion in assessing the relevancy of evidence, *United States v. Lampson,* 627 F.2d 62, 66 (7th Cir. 1980),

and that a trial court's ruling that evidence is relevant will be reversed only on a clear showing of abuse of discretion. *Id.* No such abuse of discretion exists here.

In ruling on the government's motion to preclude the defendant from introducing this evidence the trial court noted that:

I have reviewed these documents with a view towards whether Adolph in any place previously has indicated or said something to permit a fair conclusion that he received the money, and what I read is exactly to the contrary.... [T]he particular question I have to resolve is whether it is a proper matter for the jury to consider, given what is the issue here—the taxability of the $20,000 —whether a payment in settlement of a law suit by one person [Adolph Solomon] permits or should permit, before the fact finder, the inference that it is an acknowledgement on his part that he received the money, and that is the reason why the settlement was made; and, therefore, tax consequences should not befall the person who received the funds in the first instance [Allan Solomon]. I do not think so, and I am not going to let that in.

The court has clearly delineated the reasons for its decision and we agree that those reasons are legally sound. In an exercise of discretion, the trial court must be guided by sound legal principles. We hold that the trial court articulated the sound legal reasons in its decision thus precluding the introduction of evidence relating to the $20,000 payment made by Adolph Solomon in settlement of the civil action, and we therefore agree with the holding of the trial court.

By the court, the decision of the trial court is affirmed.