UNITED STATES of America, Plaintiff-Appellee,

v.

Ilija ZABIC and Ivan Siprak, Defendants-Appellants.

Nos. 83–1838, 83–1839.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 17, 1984.

Decided Sept. 28, 1984.

Allan Ackerman, Mary D. Harris, Gardner, Carton & Douglas, Chicago, Ill., for defendants-appellants.

Joan B. Safford, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, COFFEY, Circuit Judge, and BEATTY, District Judge.*

COFFEY, Circuit Judge.

The defendant Ilija Zabic appeals his conviction for malicious destruction of property by explosives in violation of 18 U.S.C. § 844(i), mail fraud in violation of 18 U.S.C. § 1341, conspiracy to destroy property by explosives and commit mail fraud in violation of 18 U.S.C. § 371, and obstruction of justice in violation of 18 U.S.C. § 1503. The defendant Ivan Siprak appeals the sentence imposed after his plea of guilty to the crimes of malicious destruction of property by explosives in violation of 18 U.S.C. § 844(i), and conspiracy to commit the same in violation of 18 U.S.C. § 371. We affirm the conviction of Zabic on all counts and the sentence imposed upon Siprak.

I

The record reveals that on October 27, 1980, Ibrahim Kraja and Alil Vukic purchased a 43-unit rental apartment building located at 4417–4429 North Clifton Avenue, Chicago, Illinois, for $100,000. In November 1980, Mike Pavlovik, the real estate broker who negotiated the sale, arranged for a $350,000 fire insurance policy on the apartment building. The policy was issued with the understanding between Pavlovik and the insurer that the commercial rental building, which was partially occupied by tenants, would be renovated and fully occu-

pied. Later that month, on November 22, 1980, Kraja and Vukic sold the insured building to Ivan Buljubasic and Nedjelko Jukic for $137,500. Sometime prior to January 5, 1981, Buljubasic purchased Jukic's interest and became the sole owner of the building and the beneficiary of the fire insurance policy. The record further reveals that the People's Gas, Light & Coke Company of Illinois supplied natural gas to the commercial rental building for purposes of heating, cooking, and hot water, between 1974 and February 12, 1981, when the building was declared uninhabitable and ordered vacated.[1] This natural gas traveled via interstate pipelines and was obtained "from a variety of locations outside Illinois in the United States and Canada."

In December 1980, the defendant, Ivan Siprak, a self-employed remodeler and repairman of old buildings, asked his employee, Howard Vess, if he "wanted to burn a building?" Vess refused the offer and the following month, in January of 1981, Siprak inquired of another employee, Robert Samuelson, if he wanted to "make extra money by starting a fire." Siprak added that "after the insurance was paid off, we would remodel it ourselves." At that time Samuelson agreed to burn an unidentified building for $600.

On January 17, 1981, Siprak and Samuelson drove to 4543 North Magnolia Avenue, Chicago, Illinois, where they met the defendant Ilija Zabic in the basement of another partially occupied apartment rental building that Siprak and Zabic were renovating. Zabic uncovered a five-gallon plastic paint container that he had hidden beneath a pile of scrap plywood, displayed the gasoline contained therein, and instructed Samuelson on how to prepare and ignite a home-made delayed timer consisting of a cigarette and a book of matches.[2] The

---

* The Honorable William L. Beatty, District Judge of the Southern District of Illinois, is sitting by designation.

1. According to the evidence introduced at trial "[n]atural gas continued to be provided to vari-

ous individual apartments in 4417–4429 North Clifton through March 30, 1981."

2. Zabic instructed Samuelson to light a cigarette and place it on top of an open book of matches, parallel to the individual match sticks. Once

defendants assured Samuelson that they would place containers of gasoline throughout the building at the appropriate time and "not to worry about the money after the fire." Following this conversation, Siprak drove Samuelson to the building owned by Ivan Buljubasic at 4417–4429 North Clifton Avenue and pointed out that this was the building to be burned. Siprak added that this commercial rental building was unoccupied, however the unchallenged evidence introduced at trial directly contradicts this statement and reveals that tenants were legally residing in the building throughout the month of January, 1981.

On January 20, 1981, at approximately 3:00 a.m., Samuelson entered the building at 4417–4429 North Clifton and located eight or nine of the five-gallon plastic containers filled with gasoline that had been strategically placed throughout the building by the defendants. Samuelson poured the gasoline onto the floor of five vacant apartments in the rear of the building, prepared and ignited home-made delayed timers, using a cigarette and a book of matches as instructed by Zabic, and then proceeded to the front of the building where he emptied additional containers of gasoline onto the floor of other vacant apartments and again ignited home-made delayed timers. Before the Chicago Fire Department could bring the ensuing fire under control, the blaze destroyed a number of unoccupied apartment units in the rear of the U-shaped courtyard building.

Later that same day Samuelson returned home, notified Siprak of the fire, and the two of them traveled to a local tavern where they met Zabic. The defendants informed Samuelson that he "did a good job on the back of the building [but] the front part wasn't that good because the fire department put it out." The defendants asked Samuelson to "go back and finish it," promising to pay him $300 for the already burned rear portion and an additional $300 for the front portion of the building. Sam-

uelson agreed to complete the task and was paid $200 with the assurance that "after the next fire … we will give it all to you." The record reveals that during this same time period, Siprak approached his employee Howard Vess and once again asked if he "wanted to burn a building," explaining that "it was for the insurance." Vess once more refused the offer.

On January 22, 1981, Samuelson met Siprak to discuss the previous fire and experiment with flammable products in Siprak's basement. Siprak tested the combustible quality of a gas and oil mix, paint thinner, and then "took about a gallon of gas out of a moped he had in the basement and put it in a paint thinner can," instructing Samuelson that this would be a sufficient quantity of gasoline to finish off the building. The next morning, at approximately 3:30 a.m., Samuelson entered the apartment building at 4417–4429 North Clifton, emptied the gallon can of gasoline down an interior stairway, prepared and ignited a home-made delayed timer as instructed by Zabic, and exited the premises. When the gasoline failed to ignite, Samuelson called Siprak claiming that he "needed more gas." Siprak responded, "we'll fix something up."

The following day, January 24, 1981, Samuelson accompanied Siprak to 4553 North Magnolia where they again met Zabic. The defendants informed Samuelson that they "had the gas" and that it would be placed in a metal locker outside the basement door at 4543 North Magnolia. The defendants instructed Samuelson to transport the gasoline to 4417–4429 North Clifton, pour the flammable liquid down an interior stairway, and prepare a home-made delayed timer that would ignite the gasoline and thus finish burning the building. At approximately 2:00 a.m. on January 25, 1981, Samuelson retrieved the gasoline from 4543 North Magnolia and placed it across the alley from 4417–4429 North Clifton. At 5:00 a.m. Samuelson returned to Clifton Avenue and asked a passerby to

---

the cigarette burned down, it would ignite the matches which would, in turn, ignite the gasoline.

"keep an eye out for the cops ... because [he] ... was going to burn the building." Samuelson entered the building, poured gasoline down the stairway that led from the third to first floor, and prepared a home-made delayed timer using a cigarette and a book of matches as instructed by Zabic. When Samuelson exited the building, he was immediately attacked by three men who wanted to take him "in the alley and cut [him] up," for attempting to start a fire in their neighborhood. The three men detained Samuelson until the police arrived to investigate the unsuccessful arson attempt. After detecting "gas on [Samuelson's] feet," the police handcuffed Samuelson and transported him to police headquarters. During interrogation, Samuelson implicated Zabic in the attempted fire and directed the police to 4543 North Magnolia where they recovered a number of five-gallon plastic containers filled with gasoline. Samuelson was returned to police headquarters and at that time he called Siprak to inform him that he (Samuelson) had been arrested.

Following his conversation with Samuelson, Siprak discussed the situation with Zabic who exclaimed that "the biggest mistake he made was to let [Samuelson] see him, to know he was involved." The next morning, January 26, 1981, Diane Siprak, the defendant's wife, following her husband's order, attended Samuelson's bond hearing "to find out what the judge was going to do with him." While at the hearing, Diane observed Ivan Buljubasic, the owner of the apartment building at 4417–4429 North Clifton, standing in the courtroom. Mrs. Siprak returned home, informed the defendants of Buljubasic's presence, and was immediately questioned by Zabic, "What was he doing there?" Shortly thereafter, Siprak informed his wife that he and Zabic were going to speak with Buljubasic and a lawyer. Siprak returned home two hours later, handed his wife $2,000, and stated that he was going to Florida with Zabic.

Soon after arriving in Florida, Siprak called his wife and inquired as to whether the police had been asking questions about him or Zabic and whether the police had visited the Siprak's house looking for him or Zabic. Diane Siprak responded "no," and was then instructed to "keep in touch" if she heard anything about Samuelson. In early February 1981, Zabic was robbed of $2,000 that he had carried with him to Florida. Zabic immediately returned to Chicago and met Siprak's wife, informing her that "he made the mistake of letting [Samuelson] point him out," and that "he was gonna turn hisself [sic] in." Zabic later instructed Diane Siprak to deny any knowledge of him or his association with her husband, if she was called to testify before a Grand Jury. In mid-February 1981, Siprak returned to Chicago for a day and then flew to Canada where he remained for the following year.

In the meantime, Ivan Buljubasic, the owner of the rental apartment building, employed a public adjuster to review the damage caused by the fires and to present a claim to the insurer. Following an investigation of the charred building, the adjuster arrived at an actual damage value loss claim of $102,382. On August 20, 1981, Buljubasic signed a proof of loss statement representing that "the fire losses on January 20 and 23, 1981, did not originate by an act, design, or procurement of Ivan Buljubasic, the beneficiary of the insurance policy." This proof of loss was mailed to the insurer by certified mail in August 1981, and was followed by an amended proof of loss in October 1981.

In November 1981, Diane Siprak was subpoenaed to testify before a Federal Grand Jury concerning the fires at 4417–4429 North Clifton Avenue. During a telephone conversation with her husband on Thanksgiving Day, she informed him of the subpoena, and was instructed to testify that neither she nor her husband knew Zabic. Siprak added that if his wife admitted to knowing Zabic, "he would shoot [her]." Following her testimony before the Grand Jury, Diane Siprak received a phone call from Zabic, inquiring as to whether or not she had been contacted by the state or Federal authorities. Mrs. Siprak denied

any such contact and was then told by Zabic that "it would be worth [her] while" to meet him at 4345 North Magnolia Avenue along with Ivan Buljubasic and a lawyer. Diane Siprak failed to attend the meeting.

On July 14, 1982, the Grand Jury charged Zabic and Siprak in a nine-count indictment, including three counts of malicious destruction of property by explosives in violation of 18 U.S.C. § 844(i), two counts of mail fraud in violation of 18 U.S.C. § 1341, one count of conspiracy to destroy property by explosives and commit mail fraud in violation of 18 U.S.C. § 371, and three counts (one for Zabic and two for Siprak) of obstructing the administration of justice in violation of 18 U.S.C. § 1503. On March 9, 1983, Siprak pled guilty to one count of malicious destruction of property by explosives and conspiracy to commit the same. Zabic pled not guilty, proceeded to trial, and on March 17, 1983, the jury found Zabic guilty of all counts charged. On April 29, 1983, Zabic was sentenced to three concurrent ten-year prison terms for the three counts of malicious destruction of property by explosives to be followed by four concurrent five-year probation terms for the two mail fraud counts, the conspiracy count, and the obstruction of justice count. Siprak was sentenced to an eight-year prison term for the malicious destruction of property by explosives count, to be followed by a five-year probation term for the conspiracy count. On appeal, Zabic contends that the district court lacked subject matter jurisdiction over the three counts of malicious destruction of property by explosives in violation of 18 U.S.C. § 844(i), that evidence of flight and concealment were improperly admitted at trial, and that the jury instructions were improper. Siprak contends that he was unduly prejudiced at the sentencing hearing by the prosecutor's alleged remarks concerning Zabic's failure to cooperate with the Government.

## II

Defendant Zabic initially claims that the district court lacked subject matter jurisdiction over the three counts of malicious destruction of property by explosives. The Government charged Zabic with violation of 18 U.S.C. § 844(i) (1982), which provides that:

"Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not more than ten years or fined not more than $10,000, or both . . . ."

Zabic acknowledges that the mixture of air and gasoline is an explosive as defined in 18 U.S.C. § 844(j), *see United States v. Xheka*, 704 F.2d 974, 978–79 (7th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 486, 78 L.Ed.2d 682 (1984); *United States v. Agrillo-Ladlad*, 675 F.2d 905, 907–12 (7th Cir.), *cert. denied*, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982); *United States v. Poulos*, 667 F.2d 939, 942 (10th Cir.1982); *United States v. Hewitt*, 663 F.2d 1381, 1389 (11th Cir.1981); *Annot.*, 61 A.L.R. Fed. 899 (1983), but asserts that the interstate travel of natural gas into the rental apartment building at 4417–4429 North Clifton Avenue is insufficient to establish that the building is used in interstate commerce or in an activity affecting interstate commerce. To support this position, Zabic relies upon language in *United States v. Mennuti*, 639 F.2d 107 (2d Cir.1981) ("*Mennuti*") that "a residence is not used in interstate or foreign commerce simply because it . . . receive[s] electric power and telephone service from companies engaged in or affecting [interstate] commerce . . . ." 639 F.2d at 110. Zabic completely overlooks the fact that in *Mennuti*, the property in question consisted of private residential "dwelling houses which were not being used for any commercial purpose at all." *Id.* at 111–12.[3] In the instant case, the

---

**3.** In *Mennuti* the buildings in issue were a one-

family dwelling that served as the defendant's

building in issue is a 43-unit rental apartment building used exclusively for commercial purposes by its owner Ivan Buljubasic, not a private dwelling used for residential purposes.

■ It is well-settled in this circuit that 18 U.S.C. § 844(i) is to be interpreted in a broad, expansive manner in order to further Congress' intent in enacting this particular provision of the Federal anti-explosive statute. *United States v. Russell,* 738 F.2d 825, 827 (7th Cir.1984) (*"Russell"*); *United States v. Sweet,* 548 F.2d 198, 200–02 (7th Cir.), *cert. denied,* 430 U.S. 969, 97 S.Ct. 1653, 52 L.Ed.2d 361 (1977) (*"Sweet"*). *See also United States v. Michaels,* 726 F.2d 1307, 1309–10 (8th Cir. 1984); *United States v. Giordano,* 693 F.2d 245, 249 (2d Cir.1982); *United States v. Andrini,* 685 F.2d 1094, 1095–96 (9th Cir.1982); *United States v. Barton,* 647 F.2d 224, 231–33 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. Grossman,* 608 F.2d 534, 536–37 (4th Cir.1979); *United States v. Monholland,* 607 F.2d 1311, 1315 (10th Cir.1979); *United States v. Schwanke,* 598 F.2d 575, 578 (10th Cir. 1979); *Annot.,* 54 A.L.R.Fed. 752 (1981). According to Congress:

> "Since the term affecting [interstate or foreign] 'commerce' represents the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause, *NLRB v. Reliance Fuel Corp.,* 371 U.S. 224, 226 (1963), [section 844(i)] is a very broad provision covering substantially all business property."

H.R.Rep. No. 91–1549, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad. News 4007, 4046 (emphasis added). Adhering to Congress' directive, this court held in *Sweet* that jurisdiction existed under 18 U.S.C. § 844(i) to prosecute a tavern owner who aided the fire-bombing of a competing tavern, destroying the physical structure and the stock of liquor and beer that originated from out-of-state but was purchased from local distributors. 548 F.2d at 202. In so holding, we reasoned that "[t]he punishment in 844(i) of the unlawful use of explosives in an intrastate activity, but which has an effect on interstate commerce· although *de minimis,* is within the power of Congress to enact as an appropriate means to accomplish a legitimate end under the commerce power." *Id.* Similarly, in *Russell* we held that a two-unit rental apartment building that received an out-of-state supply of natural gas and was owned · by the defendant, but not used as his personal residence, constituted business property used in an activity affecting interstate commerce, and thus jurisdiction existed under 18 U.S.C. § 844(i). 738 F.2d at 827.[4]

In the instant case, it is undisputed that the building at 4417–4429 North Clifton Avenue contained 43 rental apartment units and was used exclusively for commercial purposes by its owner Ivan Buljubasic. Thus, the rental apartment building clearly falls within the ambit of commercial "busi-

residence and another dwelling that was advertised as rental property. Throughout the opinion, the Second Circuit panel referred to both pieces of property as private dwellings used for residential purposes. Any conflict between the residential and/or commercial nature of the property was later clarified in *United States v. Barton,* 647 F.2d 224 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981), where the Second Circuit interpreted *Mennuti* as holding "that § 844(i) does not apply to *private* dwellings, notwithstanding several interstate contacts involving financing, insurance, fueling, and use of building materials." 647 F.2d at 232 n. 8 (emphasis added). *See also United States v. Giordano,* 693 F.2d 245, 250 (2d Cir. 1982) (*"Mennuti* held that only commercial enterprises are covered by the statute ....") In light of this interpretation, *Mennuti* has no bear-

ing upon this case which concerns a 43-unit rental apartment building used exclusively by its owner for commercial purposes. We express no view as to whether private dwellings are included within the ambit of 18 U.S.C. § 844(i), as this question is· not before the court at this time. ·

4. In *Russell,* jurisdiction existed under 18 U.S.C. § 844(i) because the rental apartment building was commercial "business property" used in an activity affecting interstate commerce. Though the court did not elaborate upon the interstate commerce nexus, the out-of-state supply of natural gas to the rental apartment building clearly established the requisite affect upon interstate commerce.

ness property," alluded to by Congress in establishing the broad jurisdictional scope of 18 U.S.C. § 844(i). *See Russell*, 738 F.2d at 827 (two-unit rental building is commercial "business property" for purposes of 18 U.S.C. § 844(i)). Moreover, this commercial business property received a supply of natural gas originating from outside the State of Illinois, and thereby was used in an activity affecting interstate commerce. In light of this evidence, we hold that the apartment rental building at 4417–4429 North Clifton Avenue, Chicago, Illinois, was commercial business property used in an activity affecting interstate commerce, and thus the district court had subject matter jurisdiction under 18 U.S.C. § 844(i). *Accord Russell*, 738 F.2d at 827 (rental building heated with natural gas originating from out-of-state); *United States v. Barton*, 647 F.2d at 231–33 (commercial building housed gambling business that purchased goods from out-of-state); *United States v. Andrini*, 685 F.2d at 1096 (commercial building contained inventory purchased from out-of-state); *United States v. Schwanke*, 598 F.2d at 578 (commercial building tenant operated café that purchased interstate goods); *United States v. Nashawaty*, 571 F.2d 71, 75–76 (1st Cir. 1978) (commercial building contained goods that originated out-of-state and were to be sold in interstate commerce); *Sweet*, 548 F.2d at 200–02 (commercial building contained inventory that originated from out-of-state); *United States v. Corbo*, 555 F.2d 1279, 1282 (5th Cir.), *cert. denied*, 434 U.S. 928, 98 S.Ct. 413, 54 L.Ed.2d 287 (1977) (commercial building housed bookstore that received out-of-state materials).

Defendant Zabic next contends that the trial court judge improperly admitted evidence of his "flight" to Florida for the sole purpose of allowing the jury to infer that he was guilty of the crimes charged. Zabic mistakenly analogizes the facts of this case to those in *United States v. Grose*, 525 F.2d 1115 (7th Cir.1975), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976) (*"Grose"*) and argues that evidence of flight, in and of itself, is insufficient to establish guilt beyond a reasonable doubt

in a criminal trial. In *Grose*, two defendants were convicted of armed bank robbery in violation of 18 U.S.C. § 2113(a), (d). The only evidence presented at trial against defendant Eaton was his association with defendant Grose five hours after the bank robbery in question and his departure from Chicago the night of the bank robbery. On appeal, this court stated that "evidence of flight is at best 'slight evidence' of guilt and insufficient *by itself* to support a finding of guilt beyond a reasonable doubt." *Id.* at 1120 (emphasis added). Indeed, *Grose* stands for the narrow principle of law that circumstantial evidence of flight, *by itself*, is insufficient to establish guilt beyond a reasonable doubt. In contrast to the facts in *Grose*, the Government in the instant case introduced a plethora of direct evidence, in addition to the circumstantial evidence of flight, to establish Zabic's guilt beyond a reasonable doubt.

Zabic admits that his defense counsel failed to object at trial to the Government's introduction of flight evidence, thus our analysis is whether the introduction of such evidence constitutes plain error. *United States v. Weed*, 689 F.2d 752, 756 (7th Cir.1982); Fed.R.Crim.P. 52(b). It is well-settled in this circuit that "evidence of flight and concealment is admissible to show consciousness of guilt, as well as guilt itself." *United States v. Solomon*, 688 F.2d 1171, 1176 (7th Cir.1982); *United States v. Jackson*, 572 F.2d 636, 639 (7th Cir.1978). The admissibility of circumstantial flight evidence is based upon the test set forth in *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977), that the probative value of flight as:

"circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged."

550 F.2d at 1049. *See also United States v. Solomon,* 688 F.2d at 1176; *United States v. Howze,* 668 F.2d 322, 324 (7th Cir.1982); *United States v. Jackson,* 572 F.2d at 639. In the instant case the inference that Zabic fled Chicago as a result of his participation in the illegal arson-for-profit scheme at 4417–4429 North Clifton Avenue is clearly supported by the overwhelming amount of direct evidence.

■ According to the evidence introduced at trial, Zabic assisted Siprak in remodeling and renovating old buildings and also met with Ivan Buljubasic, the owner of the rental apartment building at 4417–4429 North Clifton, on numerous occasions. Zabic retrieved and stored gasoline for use in the fires of January 20 and 25, 1981, in the basement of a building he was remodeling at 4345 North Magnolia. In addition, Zabic instructed Samuelson on how to prepare and ignite a home-made delayed timer, using a cigarette and a book of matches, explained to Samuelson the specific areas to cover with gasoline so as to insure a complete fire, and paid Samuelson $200 for burning the rear portion of the building on January 20, 1981. Once Zabic learned of Samuelson's arrest, he exclaimed that "the biggest mistake he made was to let [Samuelson] see him, to know he was involved." Following this comment, Zabic immediately left Chicago, Illinois, and traveled to Florida. While in Florida, Zabic's coconspirator Siprak called his wife, inquiring on one occasion if "the law and ... the feds" were looking for him *and* Zabic. On another occasion Siprak asked if "the law or the feds [had] been to [Siprak's] house" looking for him *and* Zabic. The record further reveals that Zabic returned to Chicago in early February 1981 and met with Diane Siprak, informing her that he "made the mistake of letting [Samuelson] point him out," and that "he was gonna turn hisself [sic] in." In light of Zabic's participation in the arson-for-profit scheme, his admitted mistake in allowing Samuelson to know

that he was involved in the scheme, his immediate departure to Florida upon Samuelson's arrest, and the inquiries, while in Florida, concerning police activities, we hold that the evidence of flight was probative of Zabic's guilt and therefore its admission at trial does not constitute plain error. Moreover, we hold that the circumstantial evidence of flight, when combined with the plethora of direct evidence concerning Zabic's participation in the arson-for-profit scheme, was more than sufficient to support the jury's finding of guilty on all counts charged.

Zabic next contends that the trial court judge erred in allowing hearsay evidence to be admitted on the issue of the defendants' attempts to conceal the arson-for-profit scheme. According to Zabic, the conspiracy to maliciously destroy property by explosives and commit mail fraud ended when Samuelson was arrested on January 25, 1982, and thus any statements made by Zabic or Siprak to Diane Siprak after this date did not fall within the coconspirator exception to the hearsay rule as set forth in Fed.R.Evid. 801(d)(2)(E).[5] Zabic claims that the defendants' statements of flight to Florida to avoid apprehension, Zabic's admitted mistake of allowing Samuelson to know that he was involved, the calls from Florida concerning police activity, Siprak's comment that he would shoot his wife if she admitted knowing Zabic or acknowledged her husband's association with Zabic, and Zabic's instruction to Diane Siprak that she should deny any knowledge of him or his association with her husband before the Federal Grand Jury, were improperly admitted at trial. *See, e.g., Krulewitch v. United States,* 336 U.S. 440, 443, 69 S.Ct. 716, 718, 93 L.Ed. 790 (1949).

On the issue of admitting hearsay testimony of concealment in the trial of an arson-for-profit scheme under 18 U.S.C. § 844(i), this court recently stated that, "[t]he crucial concern 'is the scope of the

---

**5.** Fed.R.Evid. 801(d)(2)(E) provides that:
"A statement is not hearsay if—
The statement is offered against a party and is ... a statement by a coconspirator of a party

during the course and in furtherance of the conspiracy."

conspiratorial agreement, for it is that which determines ... the duration of the conspiracy.'" *United States v. Xheka,* 704 F.2d at 985 (quoting *Grunewald v. United States,* 353 U.S. 391, 397, 77 S.Ct. 963, 970, 1 L.Ed.2d 931 (1957)). In *Xheka,* the defendants participated in a conspiracy to burn a restaurant and collect the insurance proceeds. At trial, the defendants argued that the conspiracy terminated once the restaurant was burned and thus hearsay evidence of concealment was inadmissible under Fed.R.Evid. 801(d)(2)(E). Based upon the language of the Government's indictment that "[i]t was also an object of the conspiracy that [the conspirators] concealed ... the true circumstances surrounding the burning ... in order to facilitate future claims made to the insurer," this court held that *"[t]he conspiracy continues until defendants obtain the insurance money ...." Id.* at 985–86 (emphasis added). Similarly, in the instant case, the Government's indictment, as well as the evidence introduced at trial, clearly establishes that the defendants' conspiracy existed not simply to burn the rental apartment building at 4417–4429 North Clifton Avenue, but also to obtain insurance benefits from the fire policy on the building and use such benefits to remodel the building.

■ The Government's indictment charged, *inter alia,* that:

"12. It was further part of the conspiracy that following the fires on January 20, and 25, 1981, at 4417 North Clifton, the co-conspirators, for the purpose of obtaining insurance proceeds, would and did submit and cause to be submitted by mail, statements of proof of loss to Northbrook, Zurich and Great American, which statements of proof of loss falsely represented that the insured beneficiary ... had not originated, designed or procured the losses by fire at 4417–4429 North Clifton.

13. It was further a part of the conspiracy that between January 1981 and May 1982 the defendants ILIJA ZABIC and IVAN SIPRAK, would and did conceal and hide and caused to be concealed and hidden the purposes of and acts done in furtherance of the conspiracy ...."

The evidence introduced at trial reveals that after the fire, Siprak and Zabic intended to remodel the rental apartment building at 4417–4429 North Clifton, and that the owner, Ivan Buljubasic, was to use the insurance proceeds to defray the remodeling costs. The evidence further reveals that in August 1981, Buljubasic mailed a proof of fire loss claim, and in October 1981 an amended proof of loss claim, to the insurer via the United States mails. In light of this evidence, it is clear that the conspiracy to maliciously destroy property by explosives and commit mail fraud, in order to obtain insurance benefits for remodeling purposes, continued well after January 25, 1981, and throughout the period of the defendants' statements to Diane Siprak. Accordingly, we hold that the arson-for-profit scheme was a continuing conspiracy and that the coconspirators' statements concerning concealment were admissible at trial under Fed.R.Evid. 801(d)(2)(E). *Accord Xheka,* 704 F.2d at 986–87.

Zabic next contends that the trial judge erred by instructing the jury:

"If you find beyond a reasonable doubt that the building commonly known at 4417–4429 North Clifton was a multi-unit rental apartment building and you find beyond a reasonable doubt that it received natural gas for heating or cooking, which gas moved in interstate commerce or foreign commerce, then I instruct you as a matter of law that you must find that the building commonly known at 4417–4429 North Clifton was used 'in an activity affecting interstate and foreign commerce,' as defined in Section 844(i) of Title 18, United States Code."

Zabic claims that the "interstate or foreign commerce" nexus is a jurisdictional issue to be determined as a matter of law by the court, not a factual issue to be determined by the jury. Zabic further claims that the jury instruction on the conspiracy charge was a "classical maze" that confused the jury, preventing them from considering the

**474**

conspiracy charge separate and apart from the substantive charges of malicious destruction of property by explosives and mail fraud.

█ We deal briefly with Zabic's erroneous claim that the jury improperly decided the jurisdictional issue of interstate commerce. The record clearly reveals that before trial, the district judge ruled, as a matter of law, that the Government's allegations of interstate commerce were sufficient to establish jurisdiction under 18 U.S.C. § 844(i). In order to sustain this jurisdiction at trial, the Government introduced evidence that the rental apartment building at 4417–4429 North Clifton was used exclusively for commercial purposes and received natural gas from out-of-state suppliers. *See, e.g., Russell,* 738 F.2d at 827; *United States v. Grossman,* 608 F.2d at 535–37 (interstate commerce nexus established as a jurisdictional prerequisite) and *United States v. Barton,* 647 F.2d at 231–33; *United States v. Nashawaty,* 571 F.2d at 75–76 (interstate commerce nexus sustained through evidence at trial). The jury's sole function at trial was to determine if the Government had, in fact, satisfied its burden of producing sufficient evidence to meet the jurisdictional requirements of 18 U.S.C. § 844(i). Accordingly, the trial judge instructed the jury that if they found, beyond a reasonable doubt, that the building at 4417–4429 North Clifton Avenue, Chicago, Illinois, was a "multi-unit rental apartment building and … receive[d] natural gas … in interstate commerce or foreign commerce" then, as a matter of law, the building was used in an activity affecting interstate commerce and the Government had satisfied the jurisdictional element of interstate commerce under 18 U.S.C. § 844(i). This instruction agrees with our previous analysis of the interstate commerce nexus under 18 U.S.C. § 844(i). Moreover, the instruction properly reserves the evidentiary factual determinations of jurisdiction for the jury, and the

legal conclusions to be drawn therefrom for the court. Thus we hold that the trial judge properly instructed the jury on the jurisdictional element of interstate commerce.

We turn now to Zabic's final claim that the jury was improperly instructed on the conspiracy charge. The record reveals that the trial court judge originally instructed the jury in pertinent part:

"If you find that the defendant is guilty of conspiracy as charged in Count One, you may also find the defendant guilty of a substantive offense as charged in any other count of the indictment, provided that you find that the essential elements of that count as defined in these instructions have been established beyond reasonable doubt, and provided that you also find beyond reasonable doubt,

First, that the offense defined in the substantive count was committed pursuant to the conspiracy, and

Second, that the defendant was a member of the conspiracy at the time the substantive offense was committed.

Under the conditions just defined a defendant may be found guilty of a substantive count even though he did not participate in the acts constituting the offense as defined in the substantive count. The reason for this is that a co-conspirator committing a substantive offense pursuant to a conspiracy is held to be the agent of the other co-conspirators."

Following the trial judge's complete recitation of the jury instructions, the jury retired to deliberate and soon thereafter submitted three questions to the court on the issue of whether a finding of guilty on the conspiracy count would result in a finding of guilty on the substantive counts of malicious destruction of property by explosives and mail fraud.[6] In response to the jury's

6. The questions submitted to the trial court judge were returned to the jury and never retrieved by the court to be made a part of the district court record on appeal. In their briefs,

the parties agree that the questions concern the issue of whether a finding of guilty on the conspiracy count would result in findings of guilty on the substantive counts of malicious

questions, the trial judge clarified the original instructions with supplemental instructions that provided, *inter alia:*

"[I]f you find that the defendant is guilty as charged in Count 1 of the conspiracy; namely, the conspiracy to damage and attempt to damage a building by means of an explosive device, then the acts of Samuelson in setting the fires are the acts of the defendant. However, you would not be at the end of your inquiry on Counts 2, 3 and 4. You must then turn to the instruction which contains the propositions which the government must prove to sustain the charges contained in Counts 2, 3 and 4 and determine whether the government has proved each of the propositions beyond a reasonable doubt.

If you find that the defendant is not guilty of the conspiracy charged in Count 1 to damage or attempt to damage a building by means of an explosive device, you must still consider whether the defendant is guilty on Counts 2, 3 and 4.

\*    \*    \*    \*    \*    \*

[I]f you find that the defendant is guilty as charged in Count 1 of the conspiracy to commit mail fraud, then the acts of Buljubasic in submitting the insurance claim and in signing it are the acts of the defendant. However, you would not be at the end of your inquiry on Counts 5 and 6. You must then turn to the instructions which contain the propositions which the government must prove to sustain the charges contained in Counts 5 and 6 and determine whether the government has proved each of these propositions beyond a reasonable doubt. If you find that the defendant is not guilty of the conspiracy as charged in Count 1 of the conspiracy to commit mail fraud, you must still consider whether the defendant is guilty of Counts 5 and 6 which relate to mail fraud."

destruction of property by explosives and mail fraud.

**7.** The record reveals that the Government named Ivan Buljubasic as a coconspirator in the

It is clear that the original and supplemental jury instructions comply with the standards set forth in *Pinkerton v. United States,* 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946) that a member of a conspiracy is liable for the substantive offenses committed by a coconspirator during the course of the conspiracy. *See also United States v. Redwine,* 715 F.2d 315, 322 (7th Cir.1983); *United States v. Garza-Hernandez,* 623 F.2d 496, 502 (7th Cir.1980). Once questions arose among the jurors concerning the original instructions, "[t]he trial court [had to] exercise its sound discretion in determining what type of supplementary instructions should be given to a deliberating jury that seeks clarification of the law." *Davis v. Greer,* 675 F.2d 141, 145 (7th Cir.), *cert. denied,* 459 U.S. 975, 103 S.Ct. 310, 74 L.Ed.2d 289 (1982), and cases cited therein. The trial court judge was required to respond to the jurors' questions with "concrete accuracy" *Bollenbach v. United States,* 326 U.S. 607, 612–13, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946), and thus clarify the jurors' points of concern. The record in this case reveals that once the jurors raised questions, the trial judge exercised sound discretion and provided the jurors with an accurate, specific statement of the controlling law. Accordingly, we hold that the trial judge did not commit error when she acted with due promptness to provide the jury with supplemental instructions that were "sufficiently specific to clarify the jury's confusion." *Davis v. Greer,* 675 F.2d at 146.

The defendant Siprak contends that he was unduly prejudiced at the sentencing hearing by the Government's alleged reference that Siprak failed to provide information that would link Ivan Buljubasic to the conspiracy.[7] The Government stated:

"And the last thing I'd like to call attention to is that the government from the

arson-for-profit scheme to burn the building at 4417–4429 North Clifton Avenue, Chicago, Illinois, but the Government never indicted Buljubasic for his participation in the scheme.

beginning in dealing with Mr. Zabic and from the time that Mr. Siprak arrived back into the United States has made it clear that we are open to any information which they can provide which would allow us to cross that legal hurdle, which is that before we can convict a person of conspiracy, we first have got to get them in by their own acts or words."

Siprak contends that he did not know Ivan Buljubasic and that the Government improperly attempted to enhance Siprak's sentence by informing the trial judge of Siprak's alleged refusal to cooperate. We hold that Siprak's contention is without merit in light of the trial court judge's statements that:

"Now I have a sentencing philosophy which I think you all should understand. I do not punish a defendant for failing to cooperate. If a defendant does cooperate, I give credit depending on the extent and nature of the cooperation. But I do not add onto a sentence because of the failure to cooperate.

\*       \*       \*       \*       \*       \*

But again, I do not take failure to cooperate into account. It is to me a very wrong thing to do on sentencing."

Clearly, the trial judge did not consider Siprak's alleged refusal to cooperate when formulating an appropriate sentence, and thus no error was committed at the sentencing hearing.

### III

We affirm the conviction of Zabic on all counts in case 83–1838 and the sentence imposed upon Siprak in case 83–1839.