**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Dieter MUELLER, Defendant-Appellant.**

**No. 85–1908.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 8, 1986.

Decided March 11, 1986.

As Corrected April 1, 1986.

Rehearing and Rehearing En Banc
Denied April 18, 1986.

Bernard J. Nussbaum, Sonnenchein, Carlin, Nath & Rosenthal, Chicago, Ill., for defendant-appellant.

Barbara B. Berman, Asst. U.S. Atty., Joseph P. Stadmueller, U.S. Atty., Milwaukee, Wis., for plaintiff-appellee.

Before BAUER, WOOD and COFFEY, Circuit Judges.

BAUER, Circuit Judge.

Defendant Dieter Mueller was convicted of three counts of wire fraud under Title 18 U.S.C. § 1343 and one count of bank fraud under Title 18 U.S.C. § 1014 in connection with his activities as a broker of small airplanes. The defendant moved for a judgment of acquittal or for a new trial on the grounds that the evidence was insufficient to support the guilty verdicts on the wire fraud counts and that evidence on German commercial property law was necessary to support the jury's verdict on the bank fraud count. The district court denied the motion and we affirm.

I

Dieter Mueller operated as an airplane broker under two corporations, Mueller Air Food Service, and Wiro A.G. He sold airplanes primarily in Europe, but after a 1981 recession in Germany he began to sell planes in the United States.

The three wire fraud convictions in this case involved Dieter Mueller's commercial transactions with Diskont und Kredit, A.G. ["Diskont"] or Disko Leasing ["Disko"], subsidiaries of the Dresdner Bank of the Federal Republic of Germany.

The sale of four private airplanes, specifically, a Beech A–100 [Count I]; a Cessna 441 [Count II]; a Cessna 310 Q [Count III]; and a Cessna 414 [Count IV] formed the basis of the charges against Mueller. Mueller exported the three aircraft involved in Count's I through III from Ger-

many to the United States where he subsequently sold them in 1981. Each sale was evidenced by a separate agreement. These three transactions marked Diskont and Disko's first experience with sales in the United States.

All three planes were registered with the Luftfahrt Bundesamt ["LBA"], the German equivalent of the Federal Aviation Administration ["FAA"]. Diskont or Disko was the last registered owner on the LBA roles at the time Mueller received the airplanes. Evidence of ownership for both the LBA and the FAA are bills of sale showing the chain of ownership. The genuine bills of sale conveying the three planes to Mueller were drafted and retained in escrow by the Dresdner Bank of Chicago at Mueller's request. Diskont and Disko instructed Dresdner to release the bills of sale to Mueller only upon receipt of the total amount of money owed Diskont or Disko on that particular airplane. The bills of sale were never released. The proceeds from the sale of the three planes were never turned over to Disko or Diskont.

The bank fraud conviction involved Mueller's statement in a loan application to the First National Bank of Niagara, Wisconsin ["Niagara"] and Mueller's signature on an agreement called an "Enforceable Judgment" executed at the Volksbank Oberhausen-Mulheim, West Germany ["Volksbank"]. The Volksbank loaned Mueller D.M. 200,000 for his purchase of the Cessna 414 and, as evidence of its rights in that plane, had Mueller sign an "Enforceable Judgment" which it was agreed would not be registered. The Cessna 414 was then deregistered with the LBA at Mueller's request. This allowed Mueller to register the Cessna with the FAA without disclosing Volksbank's interest in the plane.

In April, 1982 Mueller applied for and received a $30,000 loan from the Niagara Bank using the same Cessna 414 as collateral for the loan. Mueller represented to the Niagara Bank that the Cessna 414 was owned free and clear of any encumbrances. Niagara attempted to register its lien in the spring of 1982 but was unsuccessful because a German corporation was listed as its owner.

Later, upon learning that Mueller had failed to turn over the proceeds of the sales to the banks, Volksbank communicated with the FAA in an effort to stop another loss.

The district court found that sufficient evidence existed to support the convictions of wire fraud. In regard to the bank fraud count, the district court held that proof of German lien law was not necessary to support the jury's findings, and that testimony of the loan officer together with the "Enforceable Judgment" was sufficient to convict Mueller of bank fraud. This appeal followed.

## II

The jury properly convicted defendant on all three counts of wire fraud under Title 18 U.S.C. § 1343. To sustain its burden under Section 1343 the government must prove (1) that defendant devised a scheme to defraud and (2) that he made use of an interstate wire in furtherance of the scheme. *United States v. Freeman,* 524 F.2d 337, 339 (7th Cir.1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1126, 47 L.Ed.2d 327 (1976). The government produced overwhelming evidence on each count to sustain its burden.

### Count I

Dieter Mueller's conviction on the first wire fraud Count stems from a scheme he devised to gain the proceeds from the sale of a Beech A–100 aircraft. Mueller entered into a lease with an option to buy agreement with Disko. Disko issued an invoice to Wiro for the plane for approximately $600,000.00 with the understanding that ownership was to remain with Disko until Mueller made full payment. Mueller then persuaded Disko to deregister the plane with the LBA for "convenience," to facilitate the registration with the FAA when the plane was sold to a third party in the United States. Next, he suggested that Disko place the bill of sale

for the plane in escrow with the Dresdner Bank of Chicago. Disko agreed and sent Dresdner Bank a bill of sale for the Beech A–100 which was to be turned over to Mueller Air Food Service upon the receipt of $600,000.00. Mueller lulled Disko into the belief that its interest was secure because the bill of sale, the document conveying title, was held safely in escrow. Mueller Air Food Service issued another bill of sale for the Beech A–100 to Robert N. Stockett, Jr. of Jackson, Mississippi, which Mueller filed with the FAA rendering Robert N. Stockett the registered owner of the Beech A–100. Mueller represented that he owned the aircraft when, in fact, he knew that Disko Leasing was the true owner of the Beech A–100. He never paid Disko Leasing for the aircraft and never informed Disko of the sale. We agree with the district court that this evidence is sufficient to sustain the government's burden under Section 1343 that the defendant knowingly devised a scheme to defraud Disko.

Mueller used interstate wire to further the scheme by causing a deposit of $626,000.00 from Robert N. Stockett to be transmitted by wire from the Mississippi Bank in Jackson, Mississippi to the First National Bank of Niagara, Niagara, Wisconsin. This satisfies the government's second requirement under Section 1343.

### Count II

■ Defendant's use of the same scheme of deregistration and issuance of a new bill of sale to defraud Disko formed the basis of the second charge of wire fraud. Again, the government produced sufficient evidence to properly convict Mueller. This time, Mueller informed Disko that he had a buyer for a 1978 Cessna 441 and deposited a down payment of $75,000.00 into the First National Bank of Niagara. Disko then issued an invoice to Mueller Air Food Service showing a purchase price of $735,000.00, and providing that ownership remain with Disko until receipt of the final payment. Disko deposited a bill of sale in escrow with the Dresdner Bank. Mueller had the plane deregistered from the LBA,

as in Count I, and issued a bill of sale from Dieter Mueller, as owner, to Mark Fontana, a partner, and filed it with the FAA. Fontana then sold the plane to Bengt Grafstrom for $63,000 cash. Mueller failed to inform Disko of the sale of the Cessna 441 or give Disko the proceeds of the sale. This was sufficient proof of a fraudulent scheme. Mueller transmitted $75,000.00 from the Fontana Aviation Account at the Niagara Bank to Disko Leasing in West Germany. This constituted use of the wires to further the fraudulent scheme.

### Count III

■ The third count of wire fraud is based on the same fraudulent scheme but involves Diskont. Mueller borrowed $50,000 in the name of Mueller Air Food Service from Diskont to purchase a 1973 Cessna 310 Q, with the understanding that ownership was to remain with Diskont until full payment on the loan was made. Mueller proceeded with the scheme as he did in Counts I and II and sold the Cessna 310 Q to Dr. Michael Garrett. Mueller never reported the sale to Diskont, nor did he pay the $45,000.00 in proceeds to Diskont. In furtherance of the scheme, the defendant caused the transfer of $45,000.00 from the Fontana Aviation Account at First National Bank of Niagara to Mueller's own account at the Dresdner Bank in Chicago.

It is clear from the evidence on all three counts that Mueller lulled Diskont and Disko into the belief that their ownership of the airplanes was secure by the procedure he suggested. Mueller received documents from the banks stating that ownership would be retained by them on the three planes. Mueller knew in situations that do not involve deregistration, bills of sale reflecting a chain of ownership are necessary for registration since both the LBA and the FAA require such a chain of ownership. The scheme was successful because of the deregistration that Mueller requested for "convenience".

■ On appeal the defendant argues that he believed in good faith that he had the right to sell the planes and keep the

proceeds as long as he was current on his obligations to the banks. Although good faith is a defense to wire fraud, the facts in evidence do not support Mueller's argument. First, the bank didn't require installment payments on two of the planes (the Cessna 441 and the Beech King Air) because Mueller assured the banks that sales and total repayment would occur quickly. Similarly, Mueller's argument that the continuation of insurance on the Cessna 310 and the Cessna 441 supports his good faith defense is against the weight of the evidence. The continuation of insurance on the Cessna and the Beech was another misrepresentation to the banks that the planes were not yet sold.

### III

■ The defendant argues that he is entitled to a new trial because he was prejudiced by the admission of testimony on foreign law. We disagree. Testimony by the German banks on their understanding of their rights under the contracts with Mueller is not testimony on German law, it is evidence of the parties intent. The bankers' testimony described the provisions of ownership retention and payment as understood by all the parties in this business relationship, not the legal effect of the documents. The testimony was proper to show their reasons for entering into agreements with Mueller.

### IV

#### Count IV

■ Ample evidence also supports the jury's findings that Mueller violated Title 18 U.S.C. § 1014. Under Section 1014 the government must demonstrate (1) that the defendant made a "false statement or report," or "willfully over value[d] any land, property or security," and (2) that he did so "for purpose of influencing in any way the action of [a described financial institution] upon any application, advance, ... commitment, or loan." *Williams v. United States,* 458 U.S. 279, 284, 102 S.Ct. 3088, 3091, 73 L.Ed.2d 767 (1982).

In October 1981 Mueller contracted to purchase a Cessna 414 and Volksbank loaned Mueller DM 200,000 for the purchase. Mueller signed a German document called an "Enforceable Judgment." It states that Volksbank could call its loan on one month's notice. Upon default, the "Enforceable Judgment" gave Volksbank the right to obtain relief in a German court in the form of a lien on the Cessna. In April, 1982 the Volksbank loan was in good standing when Mueller applied for a $30,000 loan with the Niagara Bank. Mueller used the Cessna 414 as collateral. To obtain the loan Mueller knowingly made a false statement to the Niagara Bank. He signed a clause that read:

> OWNERSHIP: Debtor is the owner of the collateral free of all liens, encumbrances and security interests (except Secured Party's Security interest).

Mueller argues that the document could be construed as creating a lien only upon default, and since the Volksbank loan was in good standing at that time no lien existed. We disagree. The "Enforceable Judgment" and the testimony relating to it, supports the jury's finding that Mueller lied on his loan application when he said that the Cessna 414 was free and clear of any liens or security interests. The "Enforceable Judgment" is a sworn notarized statement giving the Volksbank some rights in the Cessna. Whether these rights amount to a security interest or lien under American law is irrelevant. Without a doubt Mueller lied on his loan application concerning the existence of his ownership of the Cessna and in stating that the airplane was "all paid".

Unequivocal testimony by bank officers supports the governments argument that Mueller's lie on the loan application was material, and that he concealed the existence of the "Enforceable Judgment" for the purpose of influencing the First National Bank of Niagara. Mr. Maes, a bank officer, testified that had he known a security interest existed on the Cessna 414, he would have sought other collateral for the loan. The evidence supports the jury's

findings on both these essential elements. Mueller had an airplane that was security for loans from two different banks. Neither security interest was filed, and neither bank knew of the rights of the other until months later.

Mueller argues that Section 1014 requires that the false statement be knowingly made and that the government failed to prove that Mueller acted knowingly. While we agree that Section 1014 requires knowledge, we disagree that the government failed to prove this element. The judge instructed the jury that "the government must prove that the defendant knowingly made a false statement in the application for a loan." The jury in reviewing all the evidence and considering the judges instruction, found Mueller guilty of making a false statement to Niagara. This finding is supported by the evidence.

## V

■ Defendant's argument that he is entitled to a new trial because he was prejudiced by incorrect and insufficient jury instructions is without merit. Scrutiny of the court's entire charge to the jury reveals that the instructions adequately address the issues of the case.

Finally, Mueller argues that he was prejudiced because the judge failed to instruct the jury on American Commercial law. We disagree. The government met its burden under Title 18 U.S.C. § 1343 when it introduced evidence that the defendant devised a scheme to defraud Diskont and Disko and that he used an interstate wire in furtherance of the scheme. Similarly, under Title 18 U.S.C. § 1014, the government proved that the defendant lied on his loan application and that he did so for the purpose of influencing the First National Bank of Niagra. In each case, the government sustained its burden. The government is not further required to delve into the intricacies of American Commercial law.

Defendant's other arguments are equally without merit. For the foregoing reasons the judgment of the district court is

AFFIRMED.