**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Leonard STRICKLAND, Ronald B. Carson, Armand D. Moore, Neal Jackson and Otis Wilson, Defendants–Appellants.**

Nos. 89–3099, 89–3100, 89–3118, 89–3134 and 89–3135.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 6, 1990.

Decided June 11, 1991.

Jeffrey E. Stone, Scott T. Mendeloff, Joshua T. Buchman, Barry R. Elden, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for the U.S.

William H. Theis, Chicago, Ill., for Leonard Strickland.

Jerry B. Kurz, Kathryn Hall, Hall & Kurz, Chicago, Ill., for Otis Wilson.

John T. Theis, Chicago, Ill., for Ronald B. Carson.

Paul A. Wagner, Chicago, Ill., for Armand D. Moore.

Martin S. Agran, Agran & Agran, Chicago, Ill., for Neal Jackson.

Before BAUER, Chief Judge,
CUMMINGS, Circuit Judge, and
ESCHBACH, Senior Circuit Judge.

BAUER, Chief Judge.

Francis Bacon wrote, "Opportunity makes a thief." Sensing an opportunity, defendants in this consolidated group of appeals aimed to swindle approximately $236 million from the First National Bank of Chicago (the "Bank"). In one, heady morning in May 1988, defendants, posing as executives of three companies that had large accounts at the Bank, placed telephone orders that resulted in $70 million being wired out of the Bank. The funds made it as far as two banks in New York City, which were to act as middlemen. The funds were headed for three forged bank accounts in Vienna, Austria, which had been set up by one of the defendants. Alerted by the suspicious nature of these transfers—three phone calls in one morning, all from the same number, ordering large amounts of money to be wired to accounts in the same foreign institutions— Bank officials quickly sniffed-out the defendants' scheme. Before the defendants could even taste the fruits of their first wire fraud foray, or launch others, the plot was foiled and the group busted.

In these appeals, the defendants raise a bevy of issues, only a handful of which merit discussion, and none of which merit the reversal of their convictions or sentences. Because none of the defendants' discussion-worthy challenges involve the facts surrounding their wire fraud scheme, we will forego a lengthy background section. Instead, we will briefly review any necessary background facts in the course of disposing of the issues.

I. Juror–Agent Contact

■ Defendants' joint trial began on June 7, 1989. After putting on upwards of 25 witnesses, the government rested on June 19. Defendant Moore then put on his defense case, which consisted of calling an FBI agent, who had previously testified for the government, and taking the stand himself. During direct examination, Moore told a tale vastly different from the testimony given by the government witnesses. Toward the end of his story, Moore described the events of the night he was arrested. He stated that he entered the lobby of his hotel that night and noticed a man staring at him. He testified that he walked up to the man and said something, but the man did not respond. Moore did not know the man's name, but he noticed him sitting in the back of the courtroom and he pointed him out: it was Special Agent Paul Jenkins of the FBI. Moore then stated that, later that night, Jenkins and his comrades arrested him in the hotel lobby. The agents handcuffed him and pushed him up against a wall, at which time one of the agents "said something very unpleasant which I don't know if I should repeat in court or not." Transcript of Trial Proceedings ("Trial Tr."), Vol. 9, at 1431.

The evening after this testimony, some of the jurors happened upon Special Agent Jenkins and another FBI agent (neither of whom were witnesses in this case) in the hallway outside the courtroom. The agents were waiting for the elevators. One of the jurors walked up to Jenkins and asked, "You were there when Moore was arrested; what did he say?" Agent Jenkins responded, "I am not allowed to talk to you, sir," and walked away. Trial Tr., Vol. 10, at 1517. The following morning, the government brought this encounter to the attention of defense counsel and the court. The various defense counsel requested that the court voir dire the juror and/or replace him with one of the alternates. The court called in the juror and questioned him about the encounter. The court admonished the juror that he could not discuss the case with anyone (including government employees), and asked the juror if he henceforth could follow that instruction and make no contact with anyone whatsoever. The juror said he could. The court also verified that Agent Jenkins had not answered the juror's question, and that the encounter would not affect the juror's ability to be fair and impartial. Satisfied with the juror's responses, the court ruled,

over defense requests to excuse the juror, that he could remain on the jury.

Defendants argue on appeal that the agent-juror encounter affected the impartiality of the juror, prejudiced the defense, and tainted the other jurors who witnessed the encounter. Defendants also attack the district court's voir dire of the juror as insufficient and an "abuse of discretion." Appellants' Joint Brief at 14.

■■■ Improper, extrajudicial contact between the jury and a third party can indeed prejudice a defendant, *see generally Remmer v. United States*, 347 U.S. 227, 229–30, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); but it does not necessarily do so in every case. The determination of whether the contact in a given case was prejudicial or harmless lies primarily within the discretion of the trial court. *See United States v. Sababu*, 891 F.2d 1308, 1335 (7th Cir. 1989). The court may decide that the trial can proceed and the contacted juror(s) continue to sit if, "after considering factors such as the communication's nature, the jurors' responses, and the curative ability of instructions, [the court] finds that the jury can (and will) remain impartial and render a verdict based solely on the evidence, not the improper contact." *United States v. Williams*, 737 F.2d 594, 612 (7th Cir.1984) (citation omitted), *cert. denied*, 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985). The finding that a juror and/or trial can continue is one of fact that we review only for clear error. *Id.*

In this case, the court questioned the overly curious juror and determined that his ability to render a verdict based on the evidence had not been affected. In fact, at the request of the government and defense counsel, the court actually twice called in the juror for questioning before allowing him to proceed. *See* Trial Tr., Vol. 10, at 1522–25. After that voir dire, the court heard argument from defense counsel and the government. Based on all this, the court decided that the juror's unanswered question did not so reflect on his ability to follow instructions, or affect his impartiality, such that he should be dismissed. The court's inquiry was quite adequate, and its

finding that the defendants were not prejudiced will not be disturbed. *Cf. United States v. Castello*, 830 F.2d 99, 101 (7th Cir.1987) ("[H]armless contact between a juror and a security officer is not grounds for reversal.").

II. *Bruton* Challenge

■■■ Defendant Otis Wilson, one of the Bank insiders involved in the scheme, gave a rather detailed confession to a grand jury concerning his participation in the conspiracy. In that confession, Wilson incriminated not only himself but also his codefendants. The government sought to introduce Wilson's grand jury testimony at trial as evidence against him. The government offered to redact any by-name references to the non-pleading defendants and replace them with neutral terms such as "an individual" or "other individuals." Counsel for the other defendants wanted further redactions, including the elimination of more general references that, when linked with other evidence, could identify a particular defendant or defendants. *See* Trial Tr., Vol. 4, at 353–59. After hearing argument and reviewing the matter, the court ordered almost all of the redactions requested by the defendants. *Id.* at 383–87.

On appeal, defendants (all but Wilson) claim that the admission of Wilson's grand jury testimony, despite the redactions, violated their constitutional right to confront their accusers. Defendants rely, of course, upon *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), wherein the Supreme Court held that a defendant's Confrontation Clause rights were violated when his nontestifying codefendant's confession incriminating them both was admitted into evidence, even though the jury was instructed to consider the confession against only the codefendant. Since *Bruton*, however, the Court has held that the Confrontation Clause is not violated when a codefendant's confession is redacted to omit any reference to the defendant and a proper limiting instruction is given. *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). The Court expressed no opinion on whether the

substitution of neutral pronouns would suffice, *see id.* at 211 n. 5, 107 S.Ct. at 1709 n. 5, but this court, and other courts of appeals, specifically have held that the replacement of defendants' names with references such as "another person," combined with an instruction to consider the confession against only the declarant, satisfies *Bruton. See United States v. Myers*, 892 F.2d 642, 647 (7th Cir.1990) (citing cases); *see also United States v. Myers* (same case after remand), 917 F.2d 1008, 1010 (7th Cir.1990).

Defendants do not attempt to suggest that the redactions in this case were not sufficient under this body of cases (which they clearly were), but argue instead that these cases "do not give adequate deference to *Bruton.*" Appellants' Joint Brief at 16. Defendants proffer a rule whereby a nontestifying codefendant's statement "should always be redacted to omit any and all references to codefendants on trial." *Id.* Such a rule, while easy to apply, would unduly handcuff the government's ability to introduce admissible confessions and statements against a declarant in a joint trial. For example, under the defendants' rule, neutral pronouns could not be substituted for a declarant's repeated references to his cohorts even where, as here, the omission of such pronouns would render the statement meaningless—indeed, the more detailed and incriminating the statement, the more meaningless it would become. *See Myers*, 892 F.2d at 647–48. For this reason and others, we decline defendants' invitation to reverse well-established and well-reasoned precedent.

Perhaps sensing their inevitable defeat with this first line of attack, defendants make the alternative argument that Wilson's statement improperly "pointed the finger of guilt" at his individual codefendants because it "dovetailed exactly with other evidence at trial." Appellants' Joint Brief at 16. Defendants thus invoke the "evidentiary linkage" or "contextual implication" approach, inviting us to look beyond the face of the confession to other evidence adduced at trial in order to determine if Wilson's codefendants were incriminated. *See Richardson*, 481 U.S. at 206,

107 S.Ct. at 1706. This approach was explicitly rejected by the Court in *Richardson, id.* at 208–10, 107 S.Ct. at 1707–08. *See United States v. Briscoe*, 896 F.2d 1476, 1503 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). Thus, this argument is unavailing as well.

### III. Jury Instructions

■ Defendants' last, joint attack on their convictions centers on three jury instructions offered by the government and given by the court. We note at the outset that, in reviewing jury instructions, we do not pick nits. Rather, "we review jury instructions as a whole, and 'as long as the instructions treat the issues fairly and adequately, they will not be interfered with on appeal.'" *United States v. Ruiz*, No. 90–1787, 932 F.2d 1174, 1179–80 (7th Cir.1991) (quoting *United States v. McNeese*, 901 F.2d 585, 607 (7th Cir.1990)). *See also United States v. Durades*, 929 F.2d 1160, 1167 (7th Cir.1991). Thus, in the face of the defendants' "narrow-in and conquer" approach, we must be ever mindful to widen the lens and examine the challenged instructions within the context of the entire body of instructions.

### A. *The Ostrich Instruction*

■ First, defendants challenge the court's decision to give, over their objection, *see* Trial Tr., Vol. 11, at 1594–95, the following instruction:

> You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word.

Trial Tr., Vol. 11, at 1786. This conscious avoidance instruction, commonly called the "ostrich" instruction, was given immediately after an instruction that defined for the jury the word "knowingly," the operative mental state in both the bank fraud and wire fraud statutes. Earlier in the instruc-

tions, the court told the jury that mere presence at the scene, knowledge of the crime and/or association with the conspirators were insufficient to establish guilt.

The wording of the ostrich instruction was drawn from *United States v. Diaz*, 864 F.2d 544 (7th Cir.1988), *cert. denied*, 490 U.S. 1070, 109 S.Ct. 2075, 104 L.Ed.2d 639 (1989), and has been approved many times by this court, as recently as *United States v. Gonzalez*, 933 F.2d 417, 433–34 (7th Cir. 1991) (listing cases approving this formulation). Defendants' beef is not with the wording of the instruction, but with the propriety of its use in this case. They argued at the instructions conference, and again in this court, that the ostrich instruction should not have been given because the evidence supports either actual knowledge or no knowledge at all; it does not support an inference of deliberate or conscious ignorance.

If the evidence was as defendants suggest, then the giving of the ostrich instruction would, indeed, have been error. *See United States v. Giovannetti*, 919 F.2d 1223, 1228 (7th Cir.1990):

> The ostrich instruction is designed for cases in which there is evidence that the defendant, knowing or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings. A deliberate effort to avoid guilty knowledge is all the guilty knowledge the law requires.

(Citations omitted), *petition for reh'g denied*, 928 F.2d 225 (7th Cir.1991). However, viewing the evidence in the light most favorable to the government, we conclude that the evidence did not support only the binary choice suggested by the defendants. *See United States v. Bigelow*, 914 F.2d 966, 970 (7th Cir.1990), *cert. denied*, — U.S. ——, 111 S.Ct. 1077, 112 L.Ed.2d 1182 (1991).

Moore's testimony alone may have been enough to warrant the ostrich instruction. Moore, who the government alleged and the evidence showed was the driving force behind the scheme, took the stand and claimed that he had been duped by Hershel Bailey. Bailey was a member of the conspiracy who pleaded guilty and testified for the government. Moore, who lived in Detroit, claimed that he was trying to put together a "music deal" with some of the other defendants when Bailey called and offered to give him $500,000 to help in that regard. According to Moore, Bailey promised these funds if Moore would help Bailey's "friends" wire a large sum of money out of the country. Moore testified that he asked Bailey, "Why can't they do it themselves?", to which Bailey supposedly responded, "Don't worry about it. Are you interested in the money or not?" Trial Tr., Vol. 9, at 1391. Moore claimed that he set up several foreign bank accounts for Bailey, and then came to Chicago with three of his codefendants to discuss with Bailey "what was going on at his end"—and, of course, to work on the music deal. *Id.* at 1397–98. In Chicago, Moore again asked Bailey what was really going on. He testified that he did so because he knew something was fishy. Bailey responded that he simply was trying to assist some individuals who "had a lot of money that they wanted to spread around and so forth," but none of whom wanted to meet Moore. *Id.* at 1400–01. This explanation satisfied Moore. The remainder of Moore's testimony further amplified this basic theme: he was but an unknowing pawn in Bailey's scheme. (Moore added, by the way, that, at his request and without asking why, defendant Strickland set up several mail drops to receive correspondence regarding the foreign bank accounts. *Id.* at 1394–95.)

Apart from Moore's testimony, there was additional evidence that some of the defendants attempted to insulate themselves by making sure they were absent from the meetings at which the most sensitive details of the scheme were hashed out. In a similar vein, counsel for Jackson revealed, through his cross-examination of government witnesses, that his theory of defense was that Jackson, even when present at some of the meetings, did not participate or pay much attention. Further, it was the

defense theory of at least two other defendants that they had been duped by Moore or Bailey into thinking that the whole thing was on the up and up.

Similar evidence justified the use of the ostrich instruction in *Gonzalez*, at 435–36; *United States v. Rodriguez*, 929 F.2d 1224, 1227–28 (7th Cir.1991); and *United States v. Paiz*, 905 F.2d 1014, 1022–23 (7th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991). As we said in *Paiz*, a case such as this one in which a "defendant acknowledges ... association with a group but, despite circumstantial evidence to the contrary, denies knowledge of the group's illegal activity, is a paradigm case for the use of the 'ostrich' instruction." 905 F.2d at 1022 (quotations and citations omitted). Further, this evidence distinguishes this case from *Giovannetti*, 919 F.2d at 1226–29, in which there was no such evidence of deliberate avoidance of knowledge. Thus, the district court had a sufficient factual predicate to give the ostrich instruction.

### B. *The Wire Communications Instruction*

■ The primary criminal statute under which the defendants were charged was the wire fraud statute, 18 U.S.C. § 1343. That statute prohibits the use of a transmission "by means of wire, radio, or television communication in interstate or foreign commerce" to facilitate "any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises." As this language suggests, there are two key elements to the offense: a scheme to defraud, and the use of wire communications in furtherance of that scheme. *See United States v. Mueller*, 786 F.2d 293, 295 (7th Cir.1986). To meet this second element, the government introduced various pieces of evidence, including the testimony of an expert witness from the Bank. The expert witness explained in some detail the way in which the wire transfers ordered by the defendants were performed.

In its instructions, the court informed the jury that it was the government's burden to prove beyond a reasonable doubt each of the elements of wire fraud, including: "that for the purpose of carrying out the scheme, the defendants caused interstate or foreign wire communications to take place in the manner charged in the particular count." Trial Tr., Vol. 13, at 1787. The court then defined in greater detail the key terms in the statute, including "scheme" and "intent to defraud." The court reiterated that "[t]he government must prove that interstate or foreign communications facilities were used to carry out the wire fraud scheme." *Id.* at 1788–89. The court then gave, over the defendants' objection, the following instruction:

A wire transfer of funds from an Illinois bank to a New York bank or to a Vienna, Austria bank constitutes a transmission by means of wire communication in interstate or foreign commerce within the meaning of the wire fraud statute.

Trial Tr., Vol. 13, at 1789. Defendants challenged this instruction at trial, and again on appeal, on the ground that it required the jury to find for the government on the "wire communication" element of the offense, even though the evidence was "unclear" as to whether the electronic funds transfer was performed via wire.

First, defendants' characterization of the evidence is untenable. There was abundant evidence that funds were electronically transferred out of the Bank and into the New York banks, for ultimate transfer to the Austrian banks. Such interstate funds transfers constitute "wire communications" under § 1343. *See Mueller*, 786 F.2d at 296; *United States v. Sindona*, 636 F.2d 792, 802 (2d Cir.1980), *cert. denied*, 451 U.S. 912, 101 S.Ct. 1984, 68 L.Ed.2d 302 (1981). Second, defendants' characterization of the effect of the instruction is inaccurate. The challenged instruction, viewed in context, did not tell the jury that one element of the offense had been proven. The jury was twice told that it was the government's burden to prove beyond a reasonable doubt that the defendants, knowingly and with intent to defraud, used interstate or foreign wire communications.

The challenged instruction merely informed the jury that, in this case, the legal phrase "wire communication in interstate or foreign commerce" meant a wire transfer of funds from the Bank to the New York and/or Austrian banks. Thus defining for the jury the meaning of this legal phrase was not error.

### C. The Pinkerton Instruction

■ The defendants also were charged with conspiracy to commit wire and bank fraud. Accordingly, the court instructed the jury as to the elements the government was required to prove in order to sustain a conspiracy conviction. After these instructions, the court gave, over the defendants' objection, the standard Pinkerton instruction used in this circuit. See 3 Federal Criminal Jury Instructions of the Seventh Circuit 6 (1986). This instruction derives its name and content from Pinkerton v. United States, 328 U.S. 640, 647–48, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946), and is intended to inform the jury of the ramifications of agency theory in the criminal conspiracy context.

The defendants argue that the Pinkerton instruction given by the court confused the jury, a confusion that was manifested by a mid-deliberations note from the jury.[1] Defendants suggest that this confusion would have been averted had the court given a different version of the Pinkerton instruction proffered by counsel for defendant Strickland. This alternate version, a longer explication of the Pinkerton doctrine, was approved by this court in United States v. Zabic, 745 F.2d 464, 474 (7th Cir.1984). See also United States v. Manzella, 791 F.2d 1263, 1268 (7th Cir.1986) (quoting the Zabic formulation and stating that it "contains every element of the Pinkerton doctrine, arrayed in an order calculated to maximize the likelihood that the jury will grasp this complicated concept").

The first thing to note is that the defendants have only recently become unanimous in their preference for the Zabic/Manzella formulation of the Pinkerton instruction. The district court held a conference after the jury's note was received, at which the court discussed with the government and defense counsel what response should be made to the note. After some discussion, the government suggested that the court give the jury the Zabic formulation. See Trial Tr., Vol. 14, at 1813–15. Counsel for Strickland suggested that the court give the jury the original Zabic formulation, plus a lengthy, supplemental instruction that was used in that case to clarify the Pinkerton issue. See Zabic, 745 F.2d at 475. Counsel for defendants Moore, Jackson, and Carson each wanted the jury simply to be told to reread the instructions they had been given, and objected to any further instruction. Trial Tr., Vol. 14, at 1815–17. In the end, this third option was chosen by the court. See id. at 1817–18.

Putting to one side the lateness of the defendants' insistence upon the Zabic formulation, it was not error for the district court to refuse to give that formulation. Although it is true that the Zabic formulation may be "more complete," United States v. Troop, 890 F.2d 1393, 1399 (7th Cir.1989), the pattern instruction given in this case nonetheless "includes all the elements of the Pinkerton doctrine and presents the doctrine to the jury in an intelligible manner." Troop, 890 F.2d at 1399 (footnote omitted). See also United States v. McKenzie, 922 F.2d 1323, 1330 & n. 3 (7th Cir.1991) (citing pattern instruction as example of adequate Pinkerton instruction). The choice between the two versions was the district court's, so long as the version chosen properly focused on the defendants' acts, on whether they were a crime, on whether guilt of these crimes was proved beyond a reasonable doubt, and

---

1. The note read, "We need a further interpretation of the law, Section 1344 [bank fraud], as pertaining to Count I [conspiracy count], influencing Counts 2 through 5 [substantive bank and wire fraud counts]. Special attention to the words 'executes' and 'attempting to execute' [quoting from 18 U.S.C. § 1344]. We can go no further until we hear." Attached to the note were the Pinkerton instruction and the instruction concerning the elements of § 1344 bank fraud. See Trial Tr., Vol. 14, at 1807.

on whether the crimes were committed in furtherance of the conspiracy. *See Manzella,* 791 F.2d at 1268. Our pattern instruction meets these requirements. Therefore, the court's decision to give it was not error.

## IV. Foreign Bank Records

▮▮ As part of its pre-trial investigation in this case, the government sought the account applications, signature cards, and other original documents by which Moore opened the Austrian bank accounts to which the funds had been wired. At the government's request, the district court issued an "International Letter Rogatory," or formal request, addressed to the Austrian courts. *See* Record on Appeal in *United States v. Moore,* No. 89–3118, Document # 139, Exhibit 1. The Letter Rogatory asked that the appropriate Austrian court order the banks to provide the account information and original documents needed by the U.S. Government for this prosecution. The Letter also asked that a representative from each bank execute, seal and return a "Certificate of Authenticity," a blank copy of which was attached to the Letter. *See id.* The Certificate stated that the undersigned understood that he was subject to criminal penalty for any intentionally false declarations and that the documents provided were regularly-kept business records.

Pursuant to an order by the Vienna Criminal Court, *see id.,* Exhibit 4, the Austrian banks provided the requested documents. *Id.,* Exhibits 5A, 7 & 8. The banks included cover letters in which they acknowledged that they were submitting the documents in response to an order of the Criminal Court. *Id.,* Exhibits 5 & 6. These letters also explained the documents and the methods in which they were received, used, and maintained by the banks. The banks did not, however, execute and return the Certificates of Authenticity. The U.S. Justice and State Departments followed up on this omission with Austrian officials, and eventually they received a signed, sealed statement from a "Dr. Felsenstein," Counsellor of the Austrian Federal Ministry of Justice. *See id.,* Exhibit

11. Felsenstein verified that the employees at the two Austrian banks who provided the information would have been guilty of perjury under the Austrian Criminal Code "if they had untruthfully confirmed the authenticity of the bank records produced." *Id.*

Defendant Moore filed a pre-trial motion in limine seeking to prevent the admission of the Austrian bank documents. Moore argued that the government had failed to meet the requirements for the admission of foreign records set out in 18 U.S.C. § 3505. Specifically, he claimed that the government had failed to provide sufficient "foreign certification" under § 3505(c)(2). That subsection defines "foreign certification" as "a written declaration made and signed in a foreign country by the custodian of a foreign record of regularly conducted activity or another qualified person that, if falsely made, would subject the maker to criminal penalty under the laws of that country." Following briefing and argument by the parties, the district court concluded that the requirements of § 3505 had been met. The court, therefore, denied Moore's motion in limine. Transcript of Proceedings on May 25, 1989, at 9–10.

During the trial, the bank documents obtained via the Letter Rogatory were admitted into evidence over the objection of Moore's counsel. Trial Tr., Vol. 7, at 967. A handwriting expert identified the signatures on the bank documents as having been written by Moore (under various aliases). *Id.* at 1041–47. On appeal, Moore challenges the admission of the Austrian bank records on the same grounds he advanced in his motion in limine: that the government failed to obtain an adequate certification under § 3505(c)(2).

Section 3505 was enacted by Congress in order to create "a simple, inexpensive substitute for the cumbersome and expensive procedures presently required for the admission of foreign business records." H.Rep. No. 907, 98th Cong., 2d Sess. 3, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3578, 3580 (quoted and discussed in *United States v. Hing Shair Chan,* 680 F.Supp. 521, 523 (E.D.N.Y.1988)). Al-

though the section does require certification as to the way in which the records were kept and some declaration that the record-provider would be punishable under the criminal laws of the foreign country should he provide a false statement, it does not require the use of a "magic form" upon which the employee/record-provider of the foreign company must certify that he is aware that his answers come under penalty of perjury. And that is Moore's real beef here—that no single form contains both a declaration of the authenticity of the documents and a certification that the declarant knows he is under penalty of perjury. Moore's argument misses the point, and mischaracterizes § 3505. That section was not intended to add technical roadblocks to the admission of foreign records, but, rather, to streamline the admission of such records. Further, § 3505 did not change the benchmark question in this and every situation involving the admission of documentary evidence: do the documents bear the indicia of reliability? *See Chan*, 680 F.Supp. at 525–26; *United States v. Miller*, 830 F.2d 1073, 1076–78 (9th Cir.1987), *cert. denied*, 485 U.S. 1033, 108 S.Ct. 1592, 99 L.Ed.2d 907 (1988). The district court, after reviewing the documents themselves, the explanatory cover letters from the banks, and the statement from the Austrian Ministry of Justice, determined that these documents were sufficiently reliable to be admitted. We find no error in that evidentiary ruling.

## V. Ruling on Guidelines § 2X1.1

 Defendants were sentenced on September 20, 1989. Applying the Federal Sentencing Guidelines ("Guidelines"), the court sentenced Moore to 125 months of imprisonment; Strickland to 51 months of imprisonment; Carson to 37 months of imprisonment; Wilson to 36 months of imprisonment; and Jackson to 32 months of imprisonment. All defendants also received five years of supervised release and special assessments.

The district court held a separate discussion with each defendant, his counsel, and the government regarding the proper Guidelines calculation. At his sentencing discussion, Strickland argued that he should receive a downward adjustment of "at least three levels" in his offense level under Guidelines § 2X1.1(b)(2). The version of § 2X1.1 that was effective in September 1989 was entitled "Attempt, Solicitation, or Conspiracy Not Covered by a Specific Guideline." Subsection (a) provided that, for convictions that come within the purview of § 2X1.1, the base offense level for the object offense shall apply. Subsection (b)(2) then stated that, for conspiracies, the court should decrease that base offense level by three

> unless the defendant or a coconspirator completed all the acts the conspirators believed necessary on their part for the successful completion of the offense, or the circumstances demonstrate that the conspirators were about to complete all such acts but for apprehension or interruption by some similar event beyond such person's control.

Also, the last sentence of Application Note 1 reiterated that § 2X1.1 "applies only in the absence of a more specific guideline."

Strickland argued to the district court (and Carson joined in this argument) that he should receive a downward adjustment under § 2X1.1 because the evidence showed that the scheme was not complete. The money, argued Strickland, had to reach a bank account in the United States over which Moore or someone else in the scheme had access before any of the defendants thought they had finished the job. He also argued that the evidence did not support the "about to complete" branch of § 2X1.1(b)(2). The district court rejected these arguments. The court felt that the specific fraud guideline, § 2F1.1, applied rather than § 2X1.1, and held further that, even if § 2X1.1 did apply, Strickland should not receive the three-level reduction because the crime essentially was completed when the conspirators successfully managed to have the funds wired out of the Chicago bank accounts. *See* Transcript of Strickland's Sentencing at 1844.

On appeal, all the defendants join Strickland and Carson in arguing that they should have been awarded downward adjustments under Guidelines § 2X1.1(b)(2).

832

Were we to find that such adjustments were improperly refused, we would be faced with the task of sorting out which defendants should now receive them and which had waived the point. But we need not bother; not even the defendants who timely requested a downward adjustment under § 2X1.1(b)(2) were entitled to one.

The Background note to § 2X1.1, which remains unchanged from the version effective in September 1989, explains that the three-level reduction in subsection (b)(2) is intended for cases in which "the arrest occurs well before the defendant or any co-conspirator has completed the necessary acts of the object offense." Even assuming that § 2X1.1 applies to the defendants' conspiracy convictions (because there is no "conspiracy to commit fraud" guideline), the language of subsection (b)(2) and the Background note make it clear that the defendants here do not qualify for the reduction. True enough, when the defendants were arrested, they had yet to obtain and enjoy the fruits of their fraud. The evidence showed that defendants were, however, in the process of attempting to set up bank accounts in Chicago so that the funds could be wired back from Austria, and several of the defendants already had gone shopping for Jaguars, lake-front condos, and the like. What's more, obtaining and spending the proceeds of the fraud are not, in the words of the Background note, "necessary acts of the object offense[s]," wire and bank fraud. Finally, that the jury also found the defendants guilty of the substantive, completed crimes of wire and bank fraud is further evidence that they merited no reduction for the "uncompleted" nature of their scheme.

\* \* \*

The defendants separately raise a number of other arguments attacking rulings made by the district court during trial and at sentencing. For example, Strickland challenges the district court's management of the cross-examination of Moore, which at one point touched upon Strickland's rep-

resentation of Moore on a prior, similar wire fraud charge; Carson challenges the district court's decision to reserve ruling on his motion in limine seeking the exclusion of evidence, claiming that it "chilled" his right to testify; and Moore challenges the court's two-point increase to his base offense level for obstruction of justice under Guidelines § 3C1.1, claiming that the court's decision to so enhance Moore's offense level based upon Moore's perjury on the witness stand was too "wooden."[2] The defendants have a tough row to hoe in making such arguments, as we afford the district court substantial discretion in making calls like these. *See, e.g., United States v. Glecier,* 923 F.2d 496, 502–03 (7th Cir.1991) (review of district court's management of cross-exam and evidentiary rulings); *United States v. Teta,* 918 F.2d 1329 (7th Cir.1990) (review of obstruction enhancements for perjurious testimony under § 3C1.1). Suffice it to say that, after considering these and defendants' other remaining challenges, we conclude that none of them establish error sufficient to disturb their convictions and sentences.

AFFIRMED.

---

**2.** Specifically, the district court found that "Mr. Moore's testimony was obviously [and] palpably false. In my opinion it was a willful attempt to impede the proceedings." Transcript of Moore's Sentencing at 16. This finding differentiates

this case from *United States v. Lozoya–Morales,* 931 F.2d 1216 (7th Cir.1991), in which the district court made no such finding but relied solely on an inconclusive jury verdict.