OPINION
{¶ 1} David A. Peoples, defendant-appellant, was indicted on one count of aggravated murder in violation of R.C. 2903.01, with two firearm specifications under R.C. 2941.145 and 2941.146, and one count of having a weapon while under disability. The case was tried to a jury on the foregoing counts on June 27, 2002, resulting in a finding of guilty of aggravated murder, as well as both firearm specifications.
 {¶ 2} The court sentenced defendant to 25 years to life imprisonment, plus an additional six years for discharging a weapon from a motor vehicle, plus three years for the firearm under disability specification, for a total of 34 years. The sentence was ordered to run consecutive to the term defendant was serving in federal prison.
 {¶ 3} Defendant appeals, asserting the following assignments of error:
I. It Was Error For The Court To Deny Appellants Motion To Dismiss For Violation Of The Appellants Due Process Rights As Appellant Was Extremely Prejudiced By The Action Of The State.
II. It Was Error And A Violation Of Due Process For The Court To Rule Against Appellants Motion For A Mistrial.
III. This Matter Should Be Remanded For A New Trial Because Appellant's Counsel Was Ineffective.
IV. The Jurys Verdict Was Against The Manifest Weight Of The Evidence.
 {¶ 4} Shortly after 9:00 p.m. on October 10, 1999, Delvaughn Jackson was shot and killed from a bullet fired from a gun discharged from a passing vehicle while Jackson was standing in the driveway at his home. The police arrived at the scene shortly thereafter, responding to a shooting call. When they arrived, they saw Jackson prone and positioned half in and half out of the front door of his residence. Jackson had a gunshot wound in his upper body, which resulted in his death. A recovered bullet fragment was either a 9mm or .38 caliber bullet fragment.
 {¶ 5} Dremont Davis testified that he had gone to Jackson's house in the early evening of October 10, 1999, to work on Jackson's car. After looking at the car, he decided to work on it the next day. Davis, Jackson and Davis' cousin stood in front of Davis' car at the end of the driveway and talked for a few minutes. As they stood there, they saw a small oval-shaped gray or green Dodge Chrysler, with a hump on the back, stop at a stop sign. The car turned onto Brentnell Street, where the victim lived, and a large black male began shooting out of the rear driver's side window. Initially, Davis and his cousin ran, but, after the car sped away, they returned and found Jackson on the ground. Davis carried Jackson into the house and the police were called. Upon being shown state's Exhibits C-1 through C-4, Davis identified a gray Dodge Stratus as the car he saw that night.
 {¶ 6} Afrika Jackson, defendant's cousin, was called as a court witness. At trial, she testified that she rented a Dodge Stratus from Dollar Rent-A-Car on September 27, 1999, and returned it at 11:00 p.m. on October 10, 1999. She testified that she drove the car to defendant's grandmother's house to allow defendant to use it on Saturday, October 9. She denied telling the police when they interviewed her earlier that defendant returned the car between 9:00 and 10:00 p.m. on October 10th, that he was in the company of two male blacks, that he cleaned out the car, seemed stressed and ordered her to rush the car back to Dollar Rent-A-Car.
 {¶ 7} Kevin Horan, an F.B.I. agent, works on the criminal enterprise task force, which deals with investigation of violent crimes, gangs and organized criminal activity. He met Jeremy Inglesi in the spring of 1998 through the Franklin County Sheriff's Department. Inglesi was associated with the Windsor Terrace Posse street gang and had personal knowledge of persons involved in drugs and violent crimes. Inglesi worked with the Sheriff's Department and the F.B.I. as a confidential informant in order to get a reduced sentence on narcotic charges.
 {¶ 8} During Horan's daily conversations with Inglesi, Inglesi advised him of an ongoing dispute between defendant and the victim, Delvaughn Jackson. Jackson was murdered either the same night or the same day of the conversation.
 {¶ 9} On December 14, 2000, Horan interviewed defendant and advised him that he was a primary suspect in Jackson's homicide. Defendant denied responsibility for Jackson's murder, but admitted having had a fight with him in a bar. He also acknowledged that Jackson shot up his grandmother's house, although he first pretended he did not know anything about the drive-by shooting at that house. Defendant said nothing to Horan about the alibi he introduced at trial for the time Jackson was murdered, which was that he was at a fish fry at his grandmother's house.
 {¶ 10} A Columbus police officer testified about an incident on September 26, 1999, at 2:45 a.m., when he was dispatched to the house of defendant's mother on a shooting into habitation report. Defendant's mother, Ernestine Peoples, reported that gunshots were fired at her home and a car on her property. Officer Farrell saw the damage to the house. His testimony corroborated the fact that someone, allegedly Delvaughn Jackson, had shot up defendant's grandmother's house.
 {¶ 11} Horan devised a plan to rent a motel room from Inglesi and have him invite defendant there. At that time, he believed that Afrika Jackson had rented the car used in the homicide. He had a Columbus police detective question Afrika for the first time while defendant was in the motel room with Inglesi. Conversations in the motel room were monitored and audio taped. This event took place in December 1999.
 {¶ 12} Inglesi testified that defendant sold Jackson a cell phone that was turned off before Jackson thought it should. Defendant said that he and Jackson ran into each other at an after-hours pizza place where Jackson held him at gunpoint for 15 minutes threatening him and demanding the money back that he paid for the cell phone. Defendant told Inglesi that he was going to "beat his [Jackson's] ass." Sometime later, defendant and Jackson got into a fight at the C-Note Bar at Morse and Karl Roads. Jackson said he was going to get his gun and get defendant.
 {¶ 13} Defendant told Inglesi that he was with his brother, Dut, and Twyand Anderson, down the street from his grandmother's home when they heard gunshots, which resulted in the damage to his grandmother's house in September 1999. He said that they ran outside and saw Jackson drive away. Defendant told Inglesi that someone rang the doorbell or knocked on the door and began shooting through the door. Defendant said that he chased Jackson to a Sunoco station and tried to shoot him, but his gun jammed. Later that morning at the Fresno Bar, defendant told Inglesi that he was going to kill Jackson.
 {¶ 14} On October 10, 1999, Inglesi was in a car with Markell Parks who had a speaker cell phone. Defendant called and told them "I just got him," referring to Jackson. Defendant also told Inglesi he was going to pick up a person named "Peanut" and was riding down Brentnell. He had seen Jackson and two other people standing outside. He said he leaned back and shot out of the back window. Defendant said that he took the weapon apart and scattered it all over town. He also said he told Afrika and his cousin to take the rental car back.
 {¶ 15} After Inglesi had related this information to Horan, arrangements were made to get defendant to talk about the murder in a Radisson Motel room with a camera in it. Defendant, Inglesi, DeAngust Daniels and Darnel Walton were in the room when Afrika telephoned defendant. Afrika told defendant that detectives came to her house and wanted to know who had the rental car that night. She was very upset and defendant became nervous and antsy. Defendant, Inglesi and Daniels then went to Afrika's house. Defendant asked Afrika what she told the detectives and she responded that she told them that defendant instructed her to take the rental car back.
 {¶ 16} Inglesi, Daniels and defendant returned to the motel room. Inglesi pretended to make a phone call to his girlfriend. He told defendant that Jackson's girlfriend had spoken to the police and that they were ready to make an arrest for the murder and that eyewitnesses could place defendant at the scene. Defendant was skeptical, saying that it was dark. He also said that there was a guy in the yard that drove a light car, like "Papa Joe's green one." Papa Joe had a 1970's model Grand Prix. The car Dremont Davis had driven to Jackson's house the evening of October 10, 1999, which he parked at the end of the driveway, was a white 1977 Grand Prix. This car was observed by the police when they arrived at the murder scene.
 {¶ 17} Defendant, in his conversation with Inglesi, said that he did not believe that eyewitnesses could identify him because there were no lights on the street and it was dark. (A fact confirmed by the investigating officers.) He said that Afrika was a "dumbass" because she told the police he was driving. Defendant planned to tell the police that Jackson was robbing drug dealers. Defendant admitted driving the rental car; but he laughed because he knew the police would not find the gun he used. Defendant regretted having told Afrika to take the car back the same night. He said he did get all the shells out of the rental car before she took it back. They discussed "schooling" the defendant's girlfriend to come up with an alibi for where defendant was that night. Defendant said his girlfriend would do what he told her to do.
 {¶ 18} Two of the detectives had gone to interview Afrika Jackson for the first time while defendant was with Inglesi in the motel room with a camera in it. During the interview, Afrika said she rented a gray Dodge Stratus from the Dollar Rent-A-Car at the airport. Defendant's mother drove her to the car rental place. After renting the car, she drove it back and handed the keys to defendant. Appellant brought the car back to her on December 10, 1999, between 9:00 and 10:00 p.m. There were two male blacks with him. They drove the car to the back of her residence and cleaned it out. Defendant ordered her to return the rental car right away.
 {¶ 19} The detective interviewed Afrika a second time to see if she could pick out photos of the two men that were with defendant that night. She was unable to identify anyone but reiterated the same statements she made at the first interview.
 {¶ 20} The detective interviewed Twyand Anderson at the Franklin County Jail on December 5, 2000. The interview was audio taped. Anderson told the detective that the homicide was over a cell phone and that, at one point, the victim put a gun to defendant's head at the pizza shop on Woodland Avenue.
 {¶ 21} Anderson and defendant were at defendant's brother's house on a night when they heard gunshots and saw the victim driving away from the defendant's grandmother's house. They chased him and caught him at a Sunoco Station where defendant tried to shoot the victim but the gun misfired.
 {¶ 22} On the night of the homicide, Anderson drove down Brentnell with two friends and saw the victim and his family on the porch. They called defendant and he told them to meet him at 1109 Sidney. Defendant told Anderson, "I got that mother fucker." Defendant said the gun he used was a Beretta 9mm, that he broke it down and got rid of it.
 {¶ 23} Troy Cleveland testified that defendant told him about an argument he had with the victim over a cell phone. He testified that defendant and the victim got into an argument in a bar and defendant beat up the victim. In retaliation, the victim shot up defendant's grandmother's house. Defendant told Cleveland that he was looking for the victim and wanted to kill him.
 {¶ 24} Defendant told Cleveland that he drove past the victim himself, saw the victim and other black males standing on a porch, turned his car around, drove back to the house and killed the victim. Defendant told Cleveland that his intention was to kill the victim and that he gave the gun to somebody to pull the trigger. Defendant also said that he had rented the Dodge Stratus from his cousin Afrika and that he had gotten rid of the gun.
 {¶ 25} Defendant's fourth assignment of error is that the conviction is against the manifest weight of the evidence. In determining whether a verdict is against the manifest weight of the evidence, the reviewing court sits as a "thirteenth juror." As such, it is our obligation to review the entire record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses to determine "`whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Reversing a conviction as being against the manifest weight of the evidence is one reserved for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, supra, at 387. The jury is in the best position to judge the credibility of witnesses because they are able to view the witnesses and observe their demeanor, gestures and voice reflections.
 {¶ 26} A review of the foregoing testimony establishes that there was sufficient direct and circumstantial evidence to prove that defendant murdered Jackson by shooting him from a passing car while the victim was standing in his driveway. There was overwhelming evidence of bad blood between defendant and the victim. There was proof that defendant had possession of the car observed at the scene of the crime. Defendant had not only told witnesses that he intended to murder the victim, but that he had completed the murder. Defendant gave detailed admissions to Inglesi and others about how he accomplished the crime.
 {¶ 27} Defendant's fourth assignment of error is overruled.
 {¶ 28} In defendant's first assignment of error, he alleges that the trial court erred in denying defendant's motion to dismiss for violation of his due process rights which caused extreme prejudice to his alibi defense.
 {¶ 29} The murder occurred on October 10, 1999, and defendant alleges that the F.B.I. and local police concluded their investigation in the summer of 1999, but that the indictment of defendant did not take place until May 2001, and the trial did not commence until July 2002. Because of the delay and indictment and trial, defendant argues that he lost the testimony of three crucial witnesses to his alibi defense, causing that defense to be seriously weakened.
 {¶ 30} The statute of limitations provide predictable legislatively enacted limits on prosecutorial delay and the primary guarantee against bringing overly stale criminal charges. United States v. Marion (1971), 404 U.S. 307, 322. There was no statute of limitations violation in this case. The Due Process Clause has a limited rule to play in protecting against oppressive pre-trial delay. United States v. Lovasco (1977), 431 U.S. 783. In Lovasco, supra, the United States Supreme Court set forth a two-part test to determine if a pre-indictment delay constituted a due process violation. A defendant has a burden to establish that the delay resulted in actual prejudice to him. If the defendant establishes actual prejudice, the burden shifts to the state to justify the delay. This test was later adopted by the Ohio Supreme Court in State v. Luck (1984), 15 Ohio St.3d 150. When a defendant moves to dismiss an indictment, he must first produce evidence demonstrating the delay caused actual prejudice to his defense. Once the defendant has presented evidence demonstrating substantial prejudice resulting from pre-indictment delay, the state bears the burden of producing evidence and a justifiable reason for the delay. State v. Whiting (1998),84 Ohio St.3d 215; Luck, supra. Any actual prejudice suffered by the defendant must then be viewed in light of the state's reason for the delay. Proof of actual prejudice must be specific, particularized and non-speculative. It is the defendant's burden to demonstrate the exculpatory value of the alleged missing evidence. United States v. Doerr (C.A. 7, 1989), 86 F.2d 944. The death of a witness alone is insufficient to establish actual prejudice arising from a pre-indictment delay. United States v. Solomon (1982), 688 F.2d 1171.
 {¶ 31} Defendant argues that he was prejudiced because of the death of three potential alibi witnesses. At the hearing on the motion, the exhibits introduced by defendant were three death certificates indicating that, in March 2000, Katherine Jackson died; on April 26, 2000, Catherine Nessmith died; and on May 27, 2000, DeAngust Daniels died. One of the witnesses, Katherine Jackson, was defendant's grandmother.
 {¶ 32} Defendant's alibi presented at trial (although not to police when defendant was questioned shortly after the murder) was that, at the time of the shooting, defendant was at a family fish fry which began at 4:00 p.m. and ended at 11:00 p.m. on the day of the shooting. There were allegedly many people at this family fish fry who could alibi defendant. As a matter of fact, at trial, defendant's mother testified that he was at the fish fry and assisted in putting his now deceased grandmother, Katherine Jackson, to bed between 9:30 and 10:00 p.m. Defendant's aunt, Eleanor Jackson, testified that she returned to the fish fry between 9:30 and 9:45 to pick up her daughter, Afrika Jackson, and her grandson. She said that she saw her mother, the deceased grandmother, in her room getting ready for bed and that defendant was with her. She claimed defendant lifted his grandmother from her wheelchair and put her in bed. Defendant's cousin, Afrika, testified that she saw defendant at the family fish fry at 9:45 p.m. on the night that Jackson was murdered. Thus, defendant had three witnesses testify to his alibi at trial. He was not precluded from presenting his alibi defense and the testimony of the other three witnesses largely would have been cumulative to what the jury heard and rejected. Furthermore, it should be noted that the three "missing" witnesses died within five to seven months after the offense was committed. The deaths of Nessmith and Daniels were unexpected. The grandmother, who was very ill, died on March 20, 2000. Defendant argues that the police investigation was completed on December 9, 1999, and, at the latest, the indictment should have been filed then. It is obvious that these three witnesses would have been dead at the time of the trial no matter how expediently he was indicted. It is highly doubtful and speculative that the defense would have preserved these witnesses' testimony prior to their deaths, particularly the two unexpected deaths. Thus, the trial court did not err in overruling defendant's motion to dismiss because any prejudice that was shown was slight and speculative. The grandmother's testimony, at best, was merely cumulative.
 {¶ 33} Even if there was substantial prejudice in waiting until July 2001 to indict defendant, that does not end the inquiry. The prosecutors are under no duty to file charges as soon as probable cause exists and before they are satisfied that they will be able to establish the suspect's guilt beyond a reasonable doubt. Lovasco, supra, at 79. An investigative delay does not violate a defendant's right to due process even if his defense might have been prejudiced by the lapse of time. It should be kept in mind that defense was investigated by both the local police and the F.B.I. Inglesi was working as a confidential informant for the F.B.I. in an investigation into criminal activities that were ongoing. Cleveland was an F.B.I. target and Inglesi was assisting in that investigation. Cleveland was interviewed on December 6, 2000, and did not agree to testify in this case until July 9, 2001. Moreover, Inglesi was working as an undercover agent until December 2000. Disclosing him as a witness before then would have endangered his life as well as any investigations on which he was working. Thus, the state offered justifiable reasons for a delay in the indictment at least until December 2000, which was long after the last of the so-called three critical alibi witnesses had died. The delay in seeking an indictment is justifiable where, as in the instant case, one of the state's key witnesses is actively involved in another investigation and lives would be endangered if his identity was prematurely revealed. State v. Frost (Nov. 25, 1992), Cuyahoga App. No. 61295. In summary, appellant has failed to carry its burden to show substantial prejudice as a result of unjustifiable delay in seeking an indictment.
 {¶ 34} Defendant's first assignment of error is overruled.
 {¶ 35} In defendant's second assignment of error, he alleges that the trial court erred in failing to grant a mistrial because defense counsel had a conflict of interest. The trial court's decision to delay a mistrial is reviewed under an abuse of discretion standard. State v. Stout (1987), 42 Ohio App.3d 38.
 {¶ 36} Defendant claims defense counsel had a conflict of interest because he once represented one of the state's witnesses, Twyand Anderson, on a wholly unrelated criminal matter. The record discloses that defense counsel represented Anderson in 2001, on a drug charge where Anderson was sentenced to three years. Anderson had served almost two years of that sentence at the time of trial. Anderson was never a suspect in the murder of Jackson.
 {¶ 37} In order to establish a Sixth Amendment violation due to a conflict of interest, a defendant "must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." State v. Getsy (1998), 84 Ohio St.3d 180, 187. A possible conflict of interest is insufficient.
 {¶ 38} A possible conflict of interest exists where "`"interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties."'" State v. Gillard (1997), 78 Ohio St.3d 548,552. An actual conflict exists when the defendant's interest does at some point diverge with respect to a material aspect of the case.
 {¶ 39} In order for a defendant to establish an actual conflict, he must first show that "`some plausible alternative defense strategy or tactic might have been pursued. He need not show that the alternative defense would necessarily have been successful * * * but that it possessed sufficient substance to be a viable alternative.'" Gillard, supra. Secondly, the defendant must show that this alternative defense could not be pursued because of an inherent conflict with counsel's representation of a co-defendant. Prior representation of a victim or a prosecution witness in the past does not, in and of itself, constitute a conflict of interest or prejudice. State v. Lorraine (1993),66 Ohio St.3d 414.
 {¶ 40} Defendant's argument that a flaw in the discovery rules led to a conflict of interest is without merit. Plea negotiations were attempted a week before trial. The prosecutor gave defense counsel a copy of Anderson's statements (even though not required under the discovery rules) in order to induce a plea bargain. The alleged conflict was that, although Anderson's name was presented to defense counsel in discovery, Anderson told defense counsel that he had made no statement to the police. There is no reason to suspect that Anderson would have been truthful to anyone else who may have represented defendant, or that defense counsel's strategy would have been different had he not forgotten that the contents of the statement were made available to him before trial.
 {¶ 41} A lawyer represents conflicting interest "when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." State v. Manross (1988), 40 Ohio St.3d 180,182. Defense counsel had no duty to Anderson in this case. Anderson was represented by another attorney who negotiated a grant of immunity for him. Other than through vague innuendoes, defendant has not suggested either at trial or in this appeal how defense counsel's earlier representation of Anderson in the wholly unrelated case affected his trial strategy in this case.
 {¶ 42} The trial court did not abuse its discretion in overruling defendant's motion for mistrial. Defendant's second assignment of error is overruled.
 {¶ 43} In assignment of error three, defendant alleges that the judgment should be reversed and remanded for a new trial because defendant's counsel was ineffective.
 {¶ 44} Defendant has the burden of proving that he had ineffective assistance of counsel. State v. Lott (1990), 51 Ohio St.3d 160. To meet his burden of proof, defendant must show first that counsel's performance was deficient and second, that the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Strickland v. Washington (1984), 466 U.S. 668. In order to establish that counsel was deficient, defendant must demonstrate that his performance fell "below an objective standard of reasonable representation." State v. Keith (1997), 79 Ohio St.3d 514. To demonstrate that he was prejudiced by deficient performance, defendant "must prove that there exist a reasonable probability that were it not for counsel's errors, the result of the trial would have been different." Strategic or tactical decisions will not form a basis for a claim of ineffective assistance of counsel. State v. Clayton (1980), 62 Ohio St.2d 45.
 {¶ 45} Defendant's first claims that defense counsel was ineffective for continuing to represent defendant once he learned that Anderson was on the state's witness list. As we have discussed earlier, defense counsel represented Anderson only in an earlier unrelated drug case and was not representing Anderson for anything at the time of the trial in this case. Another attorney representing Anderson obtained a grant of immunity for him. Defendant's defense counsel's sole obligation was to defendant and there was nothing in the evidence or defendant's explanations to point out what defense counsel would have done differently with respect to Anderson, had he never seen him before for this trial.
 {¶ 46} Defendant presents ten briefly stated claims of ineffective assistance of counsel. Generally, in regard to complaints that defense counsel failed to object to certain actions of a prosecutor, the failure to object to error alone is not enough to sustain a claim of ineffective assistance of counsel. State v. Fears (1999),86 Ohio St.3d 329. A reasonable attorney may decide not to interrupt his adversary as a matter of trial strategy. State v. Keene (1998),81 Ohio St.3d 646. It is noted herein that defense counsel actively participated in cross-examination, was successful in persuading the court to exercise his discretion to permit an alleged alibi witness whose name was not provided in discovery or in the notice of alibi to testify, as well as an alleged eyewitness to the offense who popped up in the middle of the trial announcing she had evidence benefiting the defense.
 {¶ 47} In summary, none of the ten alleged errors, either singly or in totality, demonstrate that, even if an objection had been made and was properly sustained, the result of the trial would have differed.
 {¶ 48} We will address the claims briefly in the order that they are presented.
 {¶ 49} In claim one, defendant alleges that defense counsel allowed the prosecutor to improperly impeach Afrika's trial testimony, indicating that she brought an attorney with her to court (or was appointed one by the court). Afrika's testimony at trial differed substantially from the two statements she gave to the police detectives in December 1999. Apparently, to attempt to lessen the fact of cross-examination about the two earlier conflicting statements she gave the police detectives, defense counsel elicited testimony from her that she came to court on her own volition pursuant to a subpoena, to leave the jury with an impression that she came of her own free-will and, hence, testified truthfully. The trial court did not abuse its discretion in allowing the prosecutor to rebut that impression by the further cross-examination of this witness, who was called as the court's witness, subject to cross-examination by both parties.
 {¶ 50} The second claim was that defense counsel improperly cross-examined Afrika because he apparently was concerned how it would look if he did not know that defendant's cousin was an alibi witness. There was nothing improper in this cross-examination. As previously pointed out, the prosecutor attempted to discredit Afrika's alibi testimony by demonstrating that it was recently fabricated. Defense counsel was apparently attempting to rehabilitate the witness by placing the blame on itself. This appeared to be a trial strategy designed to benefit defendant.
 {¶ 51} In defendant's third claim regarding the same witness, Afrika, in response to defense's counsel's statement, testified that she did previously know she was an alibi witness. While this statement conflicts with her earlier one, it appears to be perhaps a futile attempt to clarify an inaccuracy rather than anything of consequence.
 {¶ 52} In claim four, defendant claims that defense counsel allowed the state to continually use leading questions when questioning its witness Inglesi. Defense counsel did object on the basis of the prosecutor's asking leading questions of Inglesi. The court noted at that time that "limited leading" is permitted to "orient why we are here." It is tactical to discontinue to make technical objections, which may be bothersome to the jury, where it is likely that they will be overruled and that the objection will serve no useful purpose. Moreover, the prosecutor was asking questions on redirect, albeit leading, reviewed evidence already before the jury prior to attack on cross-examination.
 {¶ 53} In the fifth claim, in regard to the same witness Inglesi, defendant states that defense counsel allowed the prosecutor on redirect to go outside the scope of the previous cross-examination to ask additional leading questions. The redirect of the prosecutor was arguably within the scope of the cross-examination of Inglesi where used to rebut defense counsel's attempt to show that defendant was either talking about something else or claiming innocence of the murder, contrary to Inglesi's testimony.
 {¶ 54} Defendant alleges in claim six that the defense counsel allowed prosecutorial misconduct during an in-camera conference, when the state allegedly threatened to indict defendant for other murders if counsel pursued certain witness testimony. The conference was in regard to defense counsel's attempt to question Inglesi about all of the murder cases in which he worked as a confidential informant. The prosecutor, in resisting that line of inquiry, pointed out that, if that line of questioning were pursued, the jury would learn that defendant was accused of committing another murder. It was argument before the court only and, even if it were misconduct, it had no affect on the trial. Moreover, defense counsel had no obligation to lodge a former objection at this time.
 {¶ 55} In claim seven, defendant contends that defense counsel failed to object to the prosecution playing a tape that had not been properly authenticated by the alleged speaker, Twyand Anderson. The prosecutor had asked Anderson if it was his voice on the tape, which Anderson repeatably denied. Detective Seamons later stated that she taped the interview.
 {¶ 56} In claim eight, defendant claims that defense counsel improperly indicated to the jury that he represented Anderson at the time of the taping. Apparently, the purpose of defense counsel's question was to elicit evidence upon which a juror could conclude that Anderson was not lying when Anderson denied that it was his voice on the tape. Defense counsel asked Anderson if he had told him not to talk to the police without him being present. The questioning was within the range of trial strategy and not unreasonable.
 {¶ 57} In claim nine, defendant contends that the defense counsel was ineffective because he failed to request a manslaughter instruction based upon substantial evidence of persecution by the victim which had been referred to previously in the facts. Defendant's failure to request instructions on lesser included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel. State v. Griffie (1996), 74 Ohio St.3d 332. Moreover, it is questionable that a manslaughter instruction was even proper since the alleged provocation occurred days before the murder and it would have been difficult to argue that defendant was "under the influence of sudden passion" or "in a sudden fit of rage" as required by R.C. 2903.03(A). Additionally, since defendant presented an alibi defense, that instruction may have watered down any chances that defendant had in succeeding in his principal defense of alibi.
 {¶ 58} In claim ten, defendant contends that counsel allowed the state to confuse the jury by introducing an irrelevant weapon that the jury might have construed to be the murder weapon. This contention is frivolous. The sole evidence in this case was that defendant broke the murder weapon apart and discarded it; it was crystal clear that the detective's service revolver was not ever claimed to be the murder weapon.
 {¶ 59} Defendant's third assignment of error is overruled.
 {¶ 60} Defendant's assignments of error are overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
PETREE, P.J., and BOWMAN, J., concur.
McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.